Benjamin Heikali (SBN 307466)
**FARUQI & FARUQI, LLP**
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Telephone: (424) 256-2884
Facsimile: (424) 256-2885
E-mail:  bheikali@faruqilaw.com
[Additional Captions on Signature Page]
*Attorney for Plaintiff Gerald Ross*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Gerald Ross, Derivatively on Behalf of Nominal Defendant, DEPOMED, INC., <br><br> Plaintiff, <br><br> vs. <br><br> JAMES P. FOGARTY, KAREN A. DAWES, ARTHUR J. HIGGINS, LOUIS J. LAVIGNE, JR., WILLIAM T. MCKEE, GAVIN T. MOLINELLI, ROBERT G. SAVAGE, PETER D. STAPLE, JAMES L. TYREE, SAMUEL R. SAKS, M.D., JAMES A. SCHOENECK, DAVID B. ZENOFF, SRINIVAS G. RAO, M.D., Ph.D. and R. SCOTT SHIVELY, <br><br> Defendants, <br><br> and <br><br> DEPOMED, INC. <br><br> Nominal Defendant. | Case No.: <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> 1. **Breach of Fiduciary Duty** <br> 2. **Waste of Corporate Assets** <br> 3. **Violation of § 14(a) of the Securities Exchange Act** <br><br> **JURY TRIAL DEMANDED** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Gerald Ross ("Plaintiff"), by and through his undersigned attorneys, submits this Verified Shareholder Derivative Complaint (the "Derivative Complaint") against defendants named herein. Plaintiff's information and belief is based upon, among other things, the investigation conducted by and under the supervision of her counsel which included, among other things: (a) a review and analysis of regulatory filings by Depomed, Inc. ("Depomed" or the "Company") with the United States Securities and Exchange Commission ("SEC") and other state and federal regulatory agencies; (b) a review and analysis of press releases and media reports issued and disseminated by Depomed; (c) a review of other publicly available information concerning Depomed and other entities, including articles in the news media and analyst reports; (d) complaints and related materials in litigation commenced against some or all of the Individual Defendants and/or the Company, including, but not limited to, the securities class action litigation filed against the Company and Defendants Arthur J. Higgins, James A. Schoeneck and non-party August J. Moretti in the United States District Court, Northern District of California ("Securities Class Action")[1]; and (e) applicable rules and regulations.

## SUMMARY OF THE ACTION

1.      This is a shareholder's derivative action brought for the benefit of Nominal Defendant Depomed against certain of the Company's past and present officers and directors including James P. Fogarty ("Fogarty'), Karen A. Dawes ("Dawes"), Arthur J. Higgins ("Higgins"), Louis J. Lavigne, Jr. ("Lavigne"), William T. McKee ("McKee"), Gavin T. Molinelli ("Molinelli"), Robert G. Savage ("Savage"), Peter D. Staple ("Staple"), James L. Tyree ("Tyree"), Samuel R. Saks, M.D. ("Saks"), James A. Schoeneck ("Schoeneck"), David B. Zenoff ("Zenoff"), Srinivas G. Rao, M.D., Ph.D. ("Rao"), and R. Scott Shively ("Shively") for breach of fiduciary duty, waste of corporate assets and violation of Section 14(a) of the Securities and Exchange Act of 1934 (the "Exchange Act').

---

[1] *Inchen Huang, et al. v. Depomed, Inc., et al..,* Docket No. 3:17-cv-04830 (N.D. Cal. August 18, 2017).

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

2.      Nominal Defendant Depomed is a Delaware corporation headquartered in Newark, California.  The Company engages in the development, sale and licensing of products focused on pain and other central nervous system conditions. The Company's flagship product and most profitable drug is a powerful opioid pain reliever known as NUCYNTA, which the Company acquired in April 2015.

3.      NUCYNTA comes in two forms: (i) extended release ("ER") for the management of pain severe enough to require daily, around-the-clock, long term opioid treatment; and (ii) an immediate release ("IR") version for the management of moderate to severe pain in adults.

4.      From the acquisition of NUCYNTA in April 2015, the Individual Defendants aggressively promoted NUCYNTA, adding substantial manpower to Depomed's sales force, massive and selective coverage of the different levels of prescribers and even recommending greater dosages to those prescribers. As a result, the Company announced record financial results quarter-after-quarter with NUCYNTA as the catalyst.

5.      At the same time the Company was aggressively promoting NUCYNTA, the country faced an ever-worsening opioid problem. The following chart is illustrative:



3

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

6.     As the chart demonstrates, there is a clear upward trend in deaths due to opioid drugs as of the time the Company acquired NUCYNTA in April 2015.  The Individual Defendants, an overwhelming amount of whom are experienced pharmaceutical professionals and innovators, recognized the severity of the opioid epidemic and knowingly permitted the Company to over-promote NUCYNTA to all potential prescribers, stuff the channels with product as demonstrated by the disconnect between prescription demand and wholesaler shipments in the third quarter of Fiscal Year 2016, and recommend increased dosages to prescribers.  Based on the opioid crisis and the Company's own risk disclosures concerning the sale of opioids, the Individual Defendants acted recklessly in promoting NUCYNTA, while consciously disregarding a health epidemic they were helping to fuel, and from which they and the Company profited. The Individual Defendants even incentivized the Company's sales force by providing incentive compensation based on the success of NUCYNTA.

7.     By March 2017, things had reached a head.  On March 28, 2017, U.S. Senator Claire McCaskill, the top-ranking Democrat on the Senate Homeland Security and Government Affairs Committee, announced an investigation into the marketing and sales practices of the nation's top five manufacturers of prescription opioid products, including Depomed.

8.     Senator McCaskill requested information from Depomed, including sales and marketing materials, internal addiction studies, details on compliance with government settlements and donations to third party advocacy groups.  Specifically, the letter to Depomed  requested: (i) Documents showing any internal estimates of the risk of misuse, abuse, addiction, overdose, diversion or death arising from the use of any opioid product or any estimates of these risks produced by third-party contractors or vendors; (ii) Any reports generated in the last five years summarizing or concerning compliance audits of sales and marketing policies; (iii) Marketing and business plans, including plans for direct-to-consumer and physician marketing, developed during the last five years; (iv) Quotas for sales representatives dedicated to opioid products concerning the recruitment of physicians for speakers programs during the last five years; (v) Contributions to a variety of third party advocacy organizations; and (vi) Any reports issued to government

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

agencies during the last five years in accordance with corporate integrity agreements or other settlement agreements.

9.     The letter went on to state: "This epidemic is the direct result of a calculated sales and marketing strategy major opioid manufacturers have allegedly pursued … to expand their market share and increase dependency on powerful-and often deadly-painkillers. To achieve this goal, manufactures have reportedly sought, among other techniques, to downplay the risk of addiction to their products and encourage physicians to prescribe opioids for all cases of pain and in high doses." Indeed, the Individual Defendants were well aware of the government's sensitivity concerning the opioid crisis as demonstrated when defendant Higgins admitted on September 12, 2017, that "Two and a half years [earlier], that time when we entered the [opioid] market[,] we [were] already aware of the heightened scrutiny."

10.     The Individual Defendants failed to timely disclose that the Company was under investigation and that Senator McCaskill had requested a number of documents from the Company relating to Depomed's promotional and sales practices. It was not until five months later on August 7, 2017, post market, that the Company finally disclosed the information request from Senator McCaskill as well as the receipt of subpoenas from the Maryland Attorney General and the U.S. Department of Justice related to opioid sales and marketing.  The market's reaction was swift, with Depomed's share price falling $3.09 per share, or 33.42%, to close at $6.15 on August 8, 2017. As a result, the Company now finds itself subject to a securities class action alleging violations of the federal securities laws, which was filed a little over a week after the Company's disclosures of the government investigation and subpoenas.

11.     Further, between November 2016 and June 2017, defendants Shively (the Company's Senior Vice-President and Chief Commercial Officer), Schoeneck (the Company's President and Chief Executive Officer and a Director), and Rao (the Company's Senior Vice-President and Chief Medical Officer) all resigned and were rewarded lucrative severance packages by the Board, in direct violation of the Company's Management Continuity Agreements entered into with each of the foregoing defendants, which provides severance payments for only certain

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1  voluntary/involuntary terminations, including a change in control, but does not provide any

2  severance whatsoever where the employee voluntarily resigns, as was the case here.

3       12.    The Individual Defendants breached their fiduciary duties by: (i) engaging in and/or

4  causing the Company to engage in questionable practices concerning the sales and marketing of

5  the Company's opioid products; (ii) failing to timely disclose that the U.S. Senate Committee on

6  Homeland Security and Governmental Affairs had commenced an investigation into the

7  Company's sales and marketing practices in connection with the Company's opioid products; (iii)

8  investing substantial amounts of money in the promotion and re-launch of Nucynta (the

9  Company's leading selling opioid drug), despite the Individual Defendants' acknowledgment of

10  the risks associated with the promotion of opioid drugs and the heightened legal and regulatory

11  scrutiny associated with the manufacture, sale and promotion of opioid drugs; (iv) failing to

12  implement and maintain an effective system of internal controls over the Company's practices and

13  procedures with respect to the sale and promotion of its opioid drug products; (v) failing to exercise

14  their oversight duties over the Company's sales and marketing practices with respect to its opioid

15  drug products, including ensuring employees' compliance with all federal, state and local laws,

16  rules and regulations governing the sale and promotion of opioids; (vi) failing to commence an

17  internal investigation into the Company's sales and marketing practices in connection with its

18  opioid drug products after learning of the investigation by the Senate Committee, the Department

19  of Justice ("DOJ") and the Maryland Attorney General ("Maryland AG"); (vii) recommending,

20  authorizing and/or approving severance arrangements with certain Individual Defendants that

21  improperly provided for the payment of severance benefits by the Company to certain of the

22  Company's executive officers that voluntarily resigned; (viii) consciously disregarding the risks

23  associated with the promotion and marketing of the Company's opioid products for off-label

24  purposes; (ix) improperly awarding themselves generous and excessive compensation; and (x)

25  reviewing and approving the dissemination of a proxy statement that contained material

26  misrepresentations and/or omissions.

27

28

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**JURISDICTION AND VENUE**

13.     This Court has jurisdiction over each defendant named herein.

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Alternatively, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.  There is complete diversity among the parties and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

15.     Depomed is a corporation that conducts business and maintains its executive headquarters in this District.  The Company also has held its annual shareholder meeting in this District prior to and during the time of the events complained of herein. The Individual Defendants have sufficient minimum contacts with California so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

16.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Venue is proper in this Court because a substantial portion of the transactions and wrongs complained of herein occurred in this District, including dissemination of certain materially false and misleading information to shareholders as described herein.

**PARTIES**

17.     Plaintiff Gerald Ross ("Plaintiff") is currently and has continuously been a stockholder of Depomed at all relevant times hereto.  Plaintiff is a resident of Iowa.

***Depomed***

18.     Nominal Defendant Depomed is incorporated under the laws of the state of California and maintains its principal place of business at 7999 Gateway Boulevard, Suite 300, Newark, California 94560. According to the Company's SEC filings, Depomed is a specialty pharmaceutical company engaging in the development, sale, and licensing of products focused on pain and other central nervous system ("CNS") conditions.  The Company's current portfolio includes the following six products marketed in the United States for various pain states:

7

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

a. The NUCYNTA® franchise ("Nucynta") of pain products that the Company acquired in April 2015, which includes the following two products:

   i. NUCYNTA® ER (tapentadol extended release tablets) – "a product for the management of pain severe enough to require daily, around-the-clock, long term opioid treatment, including neuropathic pain associated with diabetic peripheral neuropathy (DPN) in adults, and for which alternate treatment options are inadequate."

   ii. NUCYNTA® IR (NUCYNTA) (tapentadol) – "an immediate release version of tapentadol for the management of moderate to severe acute pain in adults."

b. Gralise® (gabapentin) – "a once-daily product for the management of postherpetic neuralgia (PHN), that we launched in October 2011."

c. CAMBIA® (diclofenac potassium for oral solution) – "a non-steroidal anti-inflammatory drug for the acute treatment of migraine attacks that [Depomed] acquired in December 2013."

d. Lazanda® (fentanyl) nasal spray – "a product for the management of breakthrough cancer pain in cancer patients 18 years of age and older who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain, that [Depomed] acquired in July 2013."

e. Zipsor® (diclofenac potassium) – "liquid filled capsules, a non-steroidal anti-inflammatory drug for the treatment of mild to moderate acute pain, that [Depomed] acquired in June 2012."

19. Depomed's stock trades on the NASDAQ stock exchange under the ticker symbol "DEPO."

***James P. Fogarty***

20. Defendant Fogarty has served as a director of the Company since October 2016, and as Chairman of the Board since March 2017. Fogarty has served on the Board's Compensation Committee since August 15, 2017, and previously was a member of the Compensation Committee from October 21, 2016 through March 28, 2017. Pursuant to the Company's proxy statement filed on Schedule 14A with the SEC on July 14, 2017 (the "2017 Proxy"), for fiscal year ended December 31, 2016 ("Fiscal 2016"), Fogarty earned and/or received $196,242 in total compensation, consisting of $16,250 in cash and $179,992 in options and restricted stock unit awards. Upon information and belief, Fogarty is a citizen of New York.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

*Karen A. Dawes*

21.     Defendant Dawes has served as a director of the Company since April 2008.  She has also served on the Audit Committee since July 2014, and served as the Chair of the Compensation Committee from prior to April 1, 2013 through March 28, 2017.  She has been a member of the Nominating and Corporate Governance Committee ("NCGC") since August 15, 2017.  According to the 2017 Proxy, since 2003, Dawes has served as President of Knowledgeable Decisions, LLC, a pharmaceutical consulting firm she founded.  From 1999 to 2003, Dawes served as Senior Vice President and U.S. Business Group Head for Bayer Corporation's U.S. Pharmaceuticals Group ("Bayer").  Prior to joining Bayer, she served as Senior Vice President, Global Strategic Marketing, for Wyeth Laboratories, Inc. ("Wyeth"), where she held responsibility for worldwide strategic marketing.  Dawes began her career in the pharmaceutical industry at Pfizer Inc. ("Pfizer"), where she held a number of positions from 1984 to 1994.  According to the 2017 Proxy, the Board considered "Ms. Dawes' experience and expertise within the following areas relevant to the Company and its business in concluding that she should serve on the Board: Marketing; Commercial Operations; Product Development; Commercial Strategy; Business Planning; Pharmaceutical Product Launch; Board Chair experience; and Compensation Committee experience."

22.     Also, the 2017 Proxy states that for Fiscal 2016, Dawes earned and/or received $202,482 in total compensation, consisting of $82,500 in cash and $119,982 in option and restricted stock unit awards.  Upon information and belief, Dawes is a citizen of Florida.

*Arthur J. Higgins*

23.     Defendant Higgins has served as a director and as President and Chief Executive Officer ("CEO") of the Company since March 28, 2017.  Since 2010, Higgins has served as a Senior Advisor to Blackstone Healthcare Partners, the healthcare team of The Blackstone Group, where he focused on product-based healthcare acquisitions.  Prior to 2010, Higgins held various high-ranking positions in several different pharmaceutical companies, including joining Bayer HealthCare AG in 2004, where he served as Chair of the Board Management of Bayer HealthCare

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

AG, a developer and manufacturer of human and animal health care products, and Chairman of the Bayer HealthCare Executive Committee.  From 2001 to 2004, Higgins served as Chairman, President and CEO of Enzon Pharmaceuticals.  Prior to joining Enzon, Higgins spent 14 years at Abbott Laboratories ("Abbott").  He also has served as a past Board member of the Pharmaceutical Research Manufacturers of America (PhRMA), of the Council of the International Federation of Pharmaceutical Manufacturers and Association (IFPMA) and President of the European Federation of Pharmaceutical Industries and Associations (EFPIA).

24.     According to the 2017 Proxy, upon joining Depomed, the Company entered into a letter agreement with Higgins whereby he would receive an annual base salary of $800,000, an annual target cash bonus of 100% of his base salary, stock options that vest over a four-year-period with a value of $1.75 million and reimbursement of reasonable out-of-pocket relocation expenses.  Further, on March 31, 2017, the Company granted Higgins 139,442 restricted stock units that would vest annually in four equal tranches, with the first 25% vesting on December 1, 2017, and 315,884 stock options that vest 12.5% on September 28, 2017 and in 42 equal installments thereafter.  Upon information and belief, Higgins is a resident of Illinois.

**_Louis J. Lavigne, Jr._**

25.     Defendant Lavigne has served as a director of the Company since July 2013. Lavigne has served as the Chair of the Audit Committee at all relevant times hereto and has been designated by the Board as the Company's Audit Committee financial expert under applicable SEC rules.  He has served on the NCGC since March 28, 2017, and on the Compensation Committee since August 15, 2017.  Lavigne currently serves on the boards of several different companies, including, but not limited to: Accuray Incorporated, a publicly-held radiation oncology company, NovoCure Limited, a publicly-held oncology company, Zynga, Inc., a publicly-held social games company, DocuSign, Inc., a privately-held digital transaction management company, Rodan + Fields, LLC, a privately held skincare company, and Puppet Inc., a privately-held technology automation software company.  Lavigne previously served on the boards of

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Allergan, Inc., Arena Pharmaceuticals, Inc., BMC Software, Inc. Equinix, Inc., Kyphon, Inc., SafeNet, Inc. and Xenova, PLC.

26.     According to the 2017 Proxy, for Fiscal 2016, Lavigne earned and/or received a total of $194,982 in total compensation, consisting of $75,000 in cash and $119,982 in option and restricted stock unit awards.  Upon information and belief, Lavigne is a citizen of California.

*William T. McKee*

27.     Defendant McKee has served as a director of the Company since March 28, 2017. McKee has been a member of the Compensation Committee and the NCGC since March 28, 2017, and has served on the Audit Committee since August 15, 2017.  From July 2010 until June 2012, McKee served as Chief Operating Officer ("COO") and Chief Financial Officer ("CFO") for EKR Therapeutics, Inc.  Until March 2010, McKee served as the Executive Vice President, CFO and Treasurer of Barr Pharmaceuticals, Inc. ("Barr"), a subsidiary of Teva Pharmaceutical Industries Limited ("Teva"), and the successor entity to Barr, which was acquired by Teva in December 2008. Mr. McKee was also Executive Vice President and Chief Financial Officer of Barr prior to its acquisition by Teva, after having served in various positions of increasing responsibility at Barr from 1995 until its acquisition.  McKee currently serves as a director of Cerulean Pharma Inc. and Agile Therapeutics, Inc.  Upon information and belief, McKee is a citizen of New Jersey.

*Gavin T. Molinelli*

28.     Defendant Molinelli served as a director of the Company from March 28, 2017 through August 15, 2017.  He currently serves as a Board observer.  Molinelli was a member of the Compensation Committee and the Chair of the NCGC from March 28, 2017 through August 15, 2017.  Molinelli is a Partner of Starboard Value L.P. ("Starboard"), the Company's second largest shareholder.  Upon information and belief, Molinelli is a citizen of New York.

*Robert G. Savage*

29.     Defendant Savage served as a director of the Company from October 2016 through August 15, 2017.  Savage served as the Chair of the Compensation Committee from March 28, 2017 through August 15, 2017, and as a member of the NCGC from October 21, 2016 through

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

August 15, 2017.  Since 2003, Savage has served as President and CEO of Strategic Imagery, LLC a pharmaceutical consulting firm that he founded.  From 2002 to 2003 Savage was Group Vice President and President for the General Therapeutics and Inflammation Business of Pharmacia Corporation (now Pfizer). Prior to 2002, Savage held several senior positions with Johnson & Johnson, including Worldwide Chairman for the Pharmaceuticals Group, Company Group Chairman responsible for the North America pharmaceuticals business, and President as well as Vice President of Sales & Marketing for Ortho-McNeil Pharmaceuticals, a Johnson & Johnson company.  According to the 2017 Proxy, the Board considered "Mr. Savage's experience and expertise within the following areas relevant to the Company and its business in concluding that he should serve on the Board: Corporate Management; Marketing; Commercial Strategy; and Board and Board committee experience."

30.     Pursuant to the 2017 Proxy, for Fiscal 2016, Savage earned and/or received $194,992 in total compensation, consisting of $15,000 in cash and $179,992 in option and restricted stock unit awards.  Upon information and belief, Savage is a citizen of Florida.

*Peter J. Staple*

31.     Defendant Staple has served as a director of the Company since November 2003. He previously served as Chairman of the Board from March 2009 through March 28, 2017.  Staple has been a member of the Compensation Committee and the Audit Committee at all relevant times hereto, and has been designated by the Board as an Audit Committee financial expert under applicable SEC rules.  Since March 2008, Staple has served as President and CEO and director of Corium International, Inc., a publicly-held biopharmaceutical company.  From 2002 to March 2008 he served as director, and from 2002 to November 2007 as Chief Executive Officer, of BioSeek, Inc., a privately-held drug discovery company.  From 1994 to 2002, Staple was a member of the senior executive team at ALZA Corporation, where he was most recently Executive Vice President, Chief Administrative Officer and General Counsel.  Prior to joining ALZA, Staple held the position of Vice President, Associate General Counsel for Chiron Corporation, a

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

biopharmaceutical company.  Mr. Staple previously served as Vice President and Associate General Counsel for Cetus Corporation, a biotechnology company.

32.     According to the 2017 Proxy, for Fiscal 2016, Staple earned and/or received $213,107 in total compensation, consisting of $93,125 in cash and $119,982 in option and restricted stock unit awards.  Upon information and belief, Staple is a citizen of California.

**James L. Tyree**

33.     Defendant Tyree has served as a director of the Company since October 2016. Tyree has been a member of the Audit Committee at all relevant times hereto, and has served on the Compensation Committee and NCGC since August 15, 2017.  Since 2014, Tyree has served as co-founder and managing partner of Tyree & D'Angelo Partners, a private equity investment firm.  Prior to that, Tyree has held numerous executive positions at Abbott, and management positions in Bristol-MyersSquibb, Pfizer and Abbott.  Tyree has served as a director of Innoviva, Inc., and ChemoCentryx, Inc.  According to the 2017 Proxy, the Board considered "Mr. Tyree's experience and expertise within the following areas relevant to the Company and its business in concluding that he should serve on the Board: Healthcare Acquisitions Corporate Management; Commercial Operations; Commercial Strategy; and Board and Board committee experience."

34.     For Fiscal 2016, Tyree earned and/or received $196,867 in total compensation from the Company, consisting of $16,875 in cash and $179,992 in option and restricted stock unit awards.  Upon information and belief, Tyree is a citizen of Illinois.

**Samuel R. Saks, M.D.**

35.     Defendant Saks served as a director of the Company from October 2012 through March 28, 2017.  Saks previously served on the Compensation Committee and the NCGC at all relevant times hereto through the date of his resignation.  According to the Company's proxy statement filed on Schedule 14A with the SEC on April 14, 2016 (the "2016 Proxy"), from October 2013 until its acquisition by Teva in May 2015, Saks served as Chief Development Officer at Auspex Pharmaceuticals, Inc. ("Auspex"), a publicly-held biopharmaceutical company focused on the treatment of orphan diseases. Saks also served as a director of Auspex from September 2009

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

through its acquisition by Teva.  From April 2011 until February 2012, Saks served as interim Chief Medical Officer of Threshold Pharmaceuticals, Inc.  From 2003 to 2009, Saks served as CEO of Jazz Pharmaceuticals, Inc. ("Jazz"), a specialty pharmaceutical company he co-founded. Prior to joining Jazz, Dr. Saks held a number of positions at ALZA Corporation ("ALZA"), which was acquired by Johnson & Johnson in 2001.  From 2001 to 2003, he was Company Group Chairman of ALZA and served as a member of Johnson & Johnson's Pharmaceutical Group Operating Committee.  From 1992 to 2001, he held various executive positions at ALZA, including Senior Vice President, Medical Affairs and Group Vice President, where he was responsible for clinical and commercial activities. He has also held clinical research positions in oncology at Schering-Plough Corporation, XOMA Corporation and Genentech, Inc.

36.     According to the 2017 Proxy, for Fiscal 2016, Saks received $189,982 in total compensation from the Company, consisting of $70,000 in cash and $119,982 in option and restricted stock unit awards. Upon information and belief, Saks is a citizen of California.

***James A. Schoeneck***

37.     Defendant Schoeneck served as a director of the Company from December 2007 through March 28, 2017, and as President and CEO of the Company from April 2011 until his resignation on March 28, 2017.  From 2005 until he joined the Company, Schoeneck was CEO of BrainCells, Inc. ("BrainCells"), a privately-held biopharmaceutical company. Prior to joining BrainCells, he served as CEO of ActivX BioSciences, Inc., a development stage biotechnology company. Schoeneck's served as President and Chief Executive Officer of Prometheus Laboratories Inc. ("Prometheus") for three years.  Prior to joining Prometheus, Schoeneck spent three years at Centocor, Inc. ("Centocor"), where he led the development of Centocor's commercial capabilities. His group launched Remicade®, which has become one of the world's largest pharmaceutical products. Earlier in his career, he spent 13 years at Rhone-Poulenc Rorer, Inc. (now Sanofi S.A.) serving in various sales and marketing positions of increasing responsibility.  According to the 2016 Proxy, the Board considered "Mr. Schoeneck's experience and expertise within the following areas relevant to the Company and its business in concluding

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

that he should serve on the Board: Corporate Strategy; Corporate Management; Commercial Strategy; Pharmaceutical Product Launch; Strategic Transactions; and Corporate Leadership."

38.    According to the 2017 Proxy, for Fiscal 2016, Schoeneck earned $6,167,070 in total compensation from the Company, consisting of $787,500 in salary, $2,362,290 in stock awards, $2,308,415 in option awards, $694,000 in cash bonuses and $14,865 in other compensation.

39.    Additionally, in connection with his resignation from the Company, on March 28, 2017, Schoeneck and the Company entered into a Waiver and Release Agreement whereby the Company agreed to pay Schoeneck: (i) $825,000, which is equal to 12-months of his then-current base salary, payable in equal installments in accordance with the Company's ordinary payroll practices, (ii) the full cost of the health insurance benefits provided to Mr. Schoeneck, his spouse and dependents, as applicable, pursuant to the terms of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA") or other applicable law through the earlier of (a) the end of the 12 month period following the date of the Waiver and Release Agreement or (b) the date on which Mr. Schoeneck is no longer eligible for such COBRA or other benefits under applicable law and (iii) up to six months of documented, bona fide, outplacement services not to exceed $5,000 per month.  Upon information and belief, Schoeneck is a citizen of California.

**David B. Zenoff**

40.    Defendant Zenoff served as a director of the Company from March 2007 until his resignation from the Board on March 28, 2017.  Zenoff served as the Chair of the NCGC and as a member of the Compensation Committee from at least 2015 until his resignation on March 28, 2017.  According to the 2017 Proxy, for Fiscal 2016, Zenoff earned and/or received $194,982 in total compensation, consisting of $75,000 in cash and $119,982 in option and restricted stock unit awards.  Upon information and belief, Zenoff is a citizen of California.

**Srinivas G. Rao, M.D., Ph.D.**

41.    Defendant Rao served as the Company's Senior Vice President and Chief Medical Officer ("CMO") from July 16, 2014 until his resignation from the Company, effective July 31, 2017.  According to the Company, Rao has "extensive experience and background in pain and

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

central nervous system diseases. He was the Founder and Chief Executive Officer of Kyalin Biosciences, a privately held biotechnology company developing a potential breakthrough therapy for autism, from its formation in 2011 through to its sale to Retrophin, Inc. in 2013.  In 2014, he served as Executive Vice President and Head of Neuroscience at Retrophin. From 2011 to 2013, Dr. Rao also served as CMO and CSO of 3 companies through his association with Avalon Ventures.  Finally, from 2001 to 2011, he was Chief Scientific Officer of Cypress Bioscience where he had a broad range of responsibilities, from business to clinical development.  He was the innovator behind Savella™, postulating that this drug's unique pharmacology would be effective for fibromyalgia.  Savella™ was approved by the FDA for this indication in 2009."

42.     According to the 2017 Proxy, for Fiscal 2016, Rao earned $1,688,507 in total compensation from the Company, consisting of $417,979 in salary, $538,345 in stock awards, $524,349 in option awards, $201,636 in non-equity incentive plan compensation and $6,198 in other compensation.

43.     Additionally, according to Rao's Waiver and Release Agreement dated June 30, 2017, attached as Exhibit 10.2 to the Company's quarterly report for the Second Quarter of 2017 filed on Form 10-Q with the SEC on August 7, 2017 ("2017 2Q 10-Q"), in connection with Rao's resignation from the Company, effective July 31, 2017, Rao will receive (i) a lump sum cash payment equal to his current annual base salary ($445,018), (ii) a lump sum cash payment equal to a pro-rata portion (seven-twelfths (7/12)) of his annual bonus he would have earned for 2017 based on actual performance of the Company over the entire year (payable in 2018 at the same time annual bonuses are paid to executives generally), (iii) health insurance benefits for a period of twelve months, and (iv) three months of outplacement services not to exceed $5,000 per month. Upon information and belief, Rao is a citizen of California.

**R. Scott Shively**

44.     Defendant Shively served as Senior Vice President and Chief Commercial Officer ("CCO") of the Company from September 2014 until his resignation from the Company on November 4, 2016.  From 2012 to 2014, Shively served as Executive Vice President and CCO of

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Zogenix, Inc. From 2009 to 2012, Shively served as Vice President—Global Commercial Disease Area Lead for Pain for Pfizer.  From 2007 to 2009, Shively served as Senior Vice President for Commercial Operations at Alpharma Pharmaceuticals Inc. ("Alpharma"), a specialty pharmaceutical company focused on pain management.  Prior to Alpharma, Shively served as Senior Vice President for Global Respiratory as well as interim President and Chief Executive Officer, USA at Altana AG and VP of Marketing for Endo Pharmaceuticals plc.

45.     According to the 2017 Proxy, for Fiscal 2016, Shively earned $2,206,548 in total compensation from the Company, consisting of $353,403 in salary, $723,150 in stock awards, $671,423 in option awards and $458,572 in other compensation (comprised of $6,233 in relocation assistance and $451,220 in severance).

46.     The 2017 Proxy also stated that in connection with Shively's resignation from the Company, pursuant to his Management Continuity Agreement with the Company effective February 12, 2016 and a release of claims executed in connection with his termination, Shively became entitled to (i) 12 months of base salary (equal to $425,000), (ii) health insurance benefits (equal to $26,220), and (iii) three months of outplacement services.  In addition, 15,625 of the restricted stock units held by Mr. Shively vested as scheduled on December 1, 2016. In connection with his resignation, Mr. Shively forfeited all of his other unvested restricted stock units and stock options, none of which remain exercisable.  Upon information and belief, Shively is a citizen of California.

47.     Defendants Fogarty, Dawes, Higgins, Lavigne, McKee, Staple and Tyree are sometimes collectively referred to herein as the "Current Director Defendants."

48.     Defendants Fogarty, Dawes, Higgins, Lavigne, McKee, Molinelli, Savage, Staple, Tyree, Saks, Schoeneck, Zenoff, Raoand Shively are sometimes collectively referred to herein as the "Individual Defendants."

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

49.     By reason of their positions as officers, directors and/or fiduciaries of Depomed and because of their ability to control the business and corporate affairs of  the Company, the

17

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Individual Defendants owed Depomed and its shareholders fiduciary obligations of care, good faith, loyalty and candor, and were, and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Depomed and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

50.     Each director and officer of the Company owes to Depomed and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company's affairs and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

51.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Depomed, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein as well as the contents of the various public statements issued by the Company. Due to their positions with Depomed, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

52.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of Depomed were required to, among other things:

a.     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b.     Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal, state and foreign laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

c.      Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

d.      Exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required  by law, and in examining and evaluating any reports or examinations, audits, or other financial  information concerning the financial condition of the Company; and

e.      When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

53.    Moreover, the Company has a Code of Business Conduct and Ethics (the "Code"), the purpose of which is to "provide you with a statement of certain key policies and procedures of the Company for you to follow in conducting business in a legally and ethically appropriate manner."  The Code, which applies to all directors, officers and employees of the Company, as well as designated contract representatives and agents, states the following, in relevant part:

### 3.      Maintain Accurate Books and Records

All Company books, records and accounts must be accurate and complete, and transactions must be recorded in a timely manner. As noted in the Company's Code of Ethics, *the Company requires full, fair, accurate, timely and understandable recording and reporting of all Company information.* You must act in a manner that ensures that all of the Company's books, records, accounts and financial statements are maintained in reasonable detail, appropriately reflect the Company's transactions and conform both to applicable legal requirements and to the Company's system of internal controls.

(Emphasis added).

54.    With respect to the Company's sales and marketing practices, the Code states the following:

### 12.      Sales and Marketing Practices; No Off Label Promotion

Each employee or other Company representative, in performing his or her duties, is responsible for truthfully conveying product attributes in accordance with government approved labeling. *You must not misstate facts or create misleading impressions in any labeling, advertising, packaging, literature or public statements. You must not promote a product for a use other than that specified in the approved product*

19

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

*label.* Omissions of important facts, safety information or wrongful emphasis of material may be misleading; the total impression of the message must be fairly balanced.

Many laws, regulations, guidelines, policies and procedures are applicable to the sale and marketing of our products, including regulations of the U.S. Food and Drug Administration (the "FDA"), the PhRMA Code on Interactions with Healthcare Professionals (the "PhRMA Code") and the Office of Inspector General (the "OIG") guidelines, among others. The Company provides specific training in these matters to its sales and marketing personnel and others in the Company involved in these activities. Violations of these laws, regulations, policies and procedures, including violations of the CCP [Corporate Compliance Plan], will lead to disciplinary actions, up to and including immediate termination of employment.

Vendors, consultants and third party service suppliers of services in connection with our sales and marketing activities must comply with all applicable laws, regulations, guidelines, policies and procedures. Each employee who engages a third party to perform these activities is responsible to ensure compliance by the third parties.

(Emphasis added).

55. With respect to the Company's prohibition against bribes or kickbacks, the Code states the following, in relevant part:

**8.       Prohibition of Gifts, Meals, or Entertainment as Bribes or Kickbacks**

***Offering gifts, meals or entertainment that are not reasonable complements to a business relationship, but that are primarily intended to obtain sales or otherwise win favor or influence, must be avoided with all parties with whom the Company does business.*** Reasonable non-cash gifts and entertainment of modest value are generally permissible business courtesies when dealing with non-government personnel and nonhealthcare professionals. Such business courtesies must be reasonably related to a legitimate purpose and otherwise in compliance with the CCP and Company policies and procedures.

Offering or accepting bribes or kickbacks to secure business is not only unacceptable, it may result in criminal prosecution. ***Offering of gifts, meals or entertainment to anyone to influence prescribing habits of Company products is prohibited. Payments and other items of value to induce or reward healthcare professionals ("HCPs") to purchase or prescribe products may constitute violations of federal and state anti-kickback laws and are strictly prohibited.*** You may offer meals and items of value to HCPs only in accordance with the CCP.

(Emphasis added).

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

56. With respect to grants and sponsored trips, the Code states the following, in relevant part:

### 13. Grants and Sponsored Trips

In the normal course of conducting business in the pharmaceutical industry, the Company may have opportunities to foster knowledge of its business, products and facilities, or to enhance the level of medical practice, by:

- Awarding Grants;
- Sponsoring medical seminars; or
- Paying speakers' fees.

Such payments must be carefully reviewed to determine whether they are permitted under the laws, regulations and ethical codes of the country or countries involved. If such payments are permitted, they must be made in accordance with the Company's policies, including the CCP, and financial control procedures. Those policies and procedures require that all such payments must be made only in exchange for bona fide services at their fair market value.

57. With respect to compliance with the law, the Code states the following, in relevant part:

### 15. Compliance with Laws, Regulations and Industry Codes

The Company is committed to conducting its business activities in accordance with applicable federal, state and local laws and regulations. You are expected to have a level of familiarity with important laws and regulations applicable to your duties for the Company that is appropriate for your position. You may contact the Legal Department with any questions regarding laws and regulations applicable to your duties.

\*\*\*

*Labeling, Advertising, and Promotion.* **FDA regulations require drug labeling and promotional material to be adequate, balanced, and truthful.** Among other things, FDA regulations require all materials and messaging used to promote our products to be fair and balanced and consistent with FDA-approved labeling. To ensure compliance with FDA regulations, you must comply with all Company policies and procedures related to promotional activities.

\*\*\*

*Product Safety and Reporting Adverse Events.* As required by applicable laws and regulations, the Company closely monitors all reports of adverse events associated with the use of Company products to ensure that we consistently adhere to the highest levels of safety and accountability. You are required to identify, record, and promptly report any safety, quality, or performance issues, or any circumstance

21

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

that suggests the occurrence of any of these issues, in accordance with applicable law and Company policy.

*Independent Medical Education Programs.* The FDA does not regulate industry supported scientific and educational activities that are independent of the supporting company's influence. **If a company influences a scientific or educational activity, however, then the activity may be considered "promotional" and subject to all FDA regulations on product promotion.** When we want to support scientific or educational activities without being subject to FDA regulation, **we must ensure that the activities are designed and carried out without any influence from the Company.** We have policies and procedures in place to ensure that our support of scientific and educational activities is appropriate.

*The PhRMA Code.* **The purpose of the PhRMA Code is to ensure that healthcare decisions are made for the benefit of patients and are not based on undue influence from pharmaceutical companies.** It provides examples of proper and improper practices regarding pharmaceutical companies' interactions with HCPs. Compliance with the PhRMA Code substantially reduces the risk of violating the federal AntiKickback Statute. The majority of the pharmaceutical industry, including the Company, has adopted and embraced the PhRMA Code, and your activities must comply with it.

\*\*\*

*Federal Anti-Kickback Statute.* The federal Anti-Kickback Statute and certain state laws make it a crime to pay or receive anything of value with the intent to induce the purchase of or prescription of drugs or devices reimbursable under federal or state healthcare programs (e.g., TRICARE, Medicare, or Medicaid). The purpose of these laws is to ensure that money, or anything else of value, does not interfere with our customers' independent clinical and formulary decisions. The Anti-Kickback Statute is interpreted broadly and prohibits a wide range of activities, such as:

- Providing an educational or research grant to an HCP (including a pharmacist) with the goal of encouraging the HCP to prescribe, dispense, or recommend a pharmaceutical product;

- Providing certain services to HCPs or other customers on the condition that they purchase or prescribe a certain amount of pharmaceutical or medical device products;

- Providing a grant to a managed care organization with the goal of influencing the formulary position of a product; and

- Paying an HCP a fee above the reasonable fair market value for services, such as participating in a Company-sponsored advisory board, in order to reward or induce purchases or prescriptions.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Some state laws are broader and apply to all items and services, beyond those reimbursed under a government healthcare program. The Company treats all HCPs and other customers as if they are subject to the anti-kickback laws, even if they do not participate in government healthcare programs. We and customers are subject to penalties for violating the anti-kickback laws. The penalties for violations include imprisonment and fines.

\*\*\*

_State Reporting and Marketing Laws._ Some state laws limit or restrict the way pharmaceutical companies interact with HCPs, especially with respect to marketing practices and items of value provided to HCPs. Some state laws place greater restrictions and requirements on companies than the PhRMA Code or federal laws.

(Emphasis added).

58.     Additionally, the Board has adopted Corporate Governance Guidelines to assist the Board in exercising its responsibilities.  According to the Corporate Governance Guidelines, the Board is responsible for the following, in relevant part:

**2.      Management Selection and Oversight**

The Board selects the CEO of the Company. The CEO selects executive management in consultation with the Board. The CEO may select non-executive management consistent with any authority delegated by the full Board.

Together, the CEO and executive management are charged with the day-to-day conduct of the Company's business. ***The Board acts as an advisor and counselor to the CEO and executive management and ultimately monitors their activities and their performance.***  Both the Board and executive management recognize that the long-term interests of shareholders are advanced by responsibly addressing the concerns of other stakeholders and interested parties, including employees, patients, payors, vendors, partners, suppliers, communities, government officials and the public at large.

\*\*\*

**4.      Director Responsibilities**

In addition to its general oversight of management, the Board, acting itself or through one or more of its committees, performs a number of specific functions, including:

a.   Selecting, evaluating and compensating the CEO and overseeing CEO succession planning;

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

b. *Providing counsel and oversight on the selection, evaluation, development and compensation of executive management;*

c. *Reviewing, approving and monitoring fundamental financial and business strategies and major corporate actions;*

d. *Assessing major risks facing the Company*, and reviewing options for their mitigation; and

e. *Ensuring processes are in place for maintaining the integrity of the Company*, including the integrity of the financial statements, *the integrity of compliance with law and ethics*, the integrity of relationships with employees, patients, payors, vendors, partners, suppliers, communities, government officials and the public at large, and the integrity of relationships with other stakeholders.

\*\*\*

**24.    Risk Oversight**

The Board shall oversee the establishment and maintenance of the Company's risk management processes. The Board may delegate primary responsibility for oversight of specific risks to any one or more of its committees.

(Emphasis added).

59.    Additionally, the Audit Committee is governed by the Audit Committee Charter (as amended and restated through May 17, 2017), which states that the Audit Committee has the following responsibilities, in relevant part:

**Internal Audit, Internal Controls and Risk Management**

Review the activities, performance, staffing, budget, annual internal audit plan (and any changes to such plan), and organizational structure of the internal audit function, as well as the qualifications of the personnel responsible for the internal audit function.

Review and discuss with management, the personnel responsible for the internal audit function and the independent auditor periodic reports prepared by the personnel responsible for the internal audit function, including the scope and results of any internal audit, and discuss any significant observations or recommendations to management and management's responses.

\*\*\*

Meet at least annually with management and the independent auditor to consider the integrity of the Company's financial reporting processes and controls, including the process by which the CEO and the CFO

24

engage in due diligence for and execute the financial statement certifications required by the Sarbanes-Oxley Act.

***Discuss with management the Company's major*** financial, accounting, ***legal and business risk exposure and the steps management has taken to monitor and control such exposure, including the Company's policies, practices and plans with respect to enterprise risk assessment, enterprise risk management,*** crisis communications, disaster recovery and the risk of fraud.

\*\*\*

In coordination with the Compensation Committee, ***annually review the Company's compensation plans, programs and policies as they relate to the Company's risk management.***

\*\*\*

## Compliance and Related Party Transactions

Discuss with management, including the Company's General Counsel, ***the Company's compliance with applicable laws and regulations or other legal matters that may have a material effect*** on the Company's financial statements and results of operations.

\*\*\*

## Other Matters

In coordination with the Nominating and Corporate Governance Committee, ***review and oversee*** (i) ***the Company's policies and procedures regarding compliance with*** applicable laws and regulations, including the Foreign Corrupt Practices Act ("FCPA"), and ***the Company's Code of Business Conduct and Ethics*** ("Code of Ethics") and (ii) ***the Company's compliance therewith.***

In coordination with the Nominating and Corporate Governance Committee,, discuss at least quarterly with management, including the Company's General Counsel (and Chief Compliance Officer if other than the General Counsel), and receive at least annually a report from the General Counsel (and Chief Compliance Officer if other than the General Counsel) covering, (i) ***the Company's policies and procedures regarding compliance with applicable laws and regulations,*** including the FCPA, and ***the Code of Ethics,*** (ii) ***the Company's compliance with such laws, regulations and Code of Ethics and (iii) the material legal or contractual risks to the Company.***

(Emphasis added).

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

60.    The Compensation Committee is governed by the Compensation Committee Charter (as amended and restated through May 17, 2017), which states that the Compensation Committee is responsible for the following, in relevant part:

### A.    Chief Executive Officer and Executive Management Compensation

Develop and periodically review Compensation Programs applicable to executive management.

(i) Evaluate the performance of the Company *against corporate goals and objectives relevant to executive management compensation approved by the Board*, and recommend to the Board for its determination the level of the Company's achievement of those goals and objectives; (ii) in consultation with the chairman of the Board, evaluate the CEO's performance in light of corporate goals and objectives and any individual goals and objectives; (iii) evaluate the performance of members of executive management (other than the CEO) in light of the CEO's evaluation of their performance and the corporate and individual goals and objectives; *(iv) recommend to the Board for its approval CEO compensation, including approving salary, grants of cash and equity awards and other incentive compensation, based on the Committee's evaluation; and (v) review and approve the compensation of executive management, other than the CEO, including approving salary, grants of cash and equity awards and other incentive compensation, based on the Committee's evaluation.* In making its determinations or recommendations, as applicable, regarding executive compensation, the Committee shall consider factors it believes appropriate, including without limitation, performance against corporate and individual goals and objectives, the impact of performance on the outlook for the Company, absolute and relative shareholder return, executive compensation at peer companies and compensation provided to executive management in past years. The CEO and members of executive management, as applicable, may not be present during voting or deliberations on his or her compensation.

Periodically, as and when appropriate and applicable, *review and approve the following as they affect the CEO and other executive management: (i) any employment agreements and severance arrangements; (ii) any change-in-control agreements and change-in-control provisions affecting any elements of compensation and benefits; and (iii) any special or supplemental compensation and benefits, including supplemental retirement benefits and the perquisites provided during and after employment.*

\*\*\*

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**B.      Executive Compensation Disclosure**

Review and discuss the Compensation Discussion and Analysis ("CD&A") with Company management and, based on such review and discussion, make a recommendation to the Board regarding whether to include the CD&A in the Company's proxy statement and/or Annual Report on Form 10-K.

Oversee, review and approve inclusion of a compensation committee report in the Company's proxy statement and/or Annual Report on Form 10-K pursuant to applicable securities rules and regulations.

***

**C.      Compensation and Benefit Plans**

Review and make recommendations to the Board with respect to adopting, amending and overseeing the policies and practices related to the Company's recoupment, or the forfeiture by employees, including the CEO, Chief Financial Officer ("CFO") and other members of executive management, of incentive compensation as the Committee determines to be necessary or appropriate and in accordance with any legal requirements.

***

Review quarterly and approve all grants of stock options, restricted stock, and restricted stock units, and any other types of awards, including stock appreciation rights or other equity-based awards that may be granted under the Company's equity incentive plans to all employees (other than the CEO, which shall be approved by the Board), consultants, independent contractors and other eligible recipients of awards.

Review and approve all cash awards under the Company's cash bonus plan and the terms of such grants, made to executive management (other than the CEO, which shall be approved by the Board).

***

**D.      Risk Oversight**

In coordination with the Audit Committee, ***annually review the Compensation Programs as they relate to the Company's risk management, determine whether and to what extent risks arising from the Compensation Programs are reasonably likely to have a material adverse effect on the Company, consider methods of mitigating any such risks***, and discuss with the Company's management the results of its review and any disclosures required by Item 402(s) of Regulation S-K.

***

27

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

### F.    Other Committee Responsibilities

***Report to the Board*** on any significant matters arising from the Committee's work.

(Emphasis added).

61.    The NCGC is governed by the Nominating and Corporate Governance Committee Charter (as amended and restated through May 17, 2017), which states that the NCGC is responsible for the following, in relevant part:

### C.    Corporate Governance

***Develop and recommend to the Board the corporate governance principles applicable to the Company, including the codes of ethical conduct and legal compliance by which the Company and its directors, officers, employees and agents will be governed, and recommend proposed changes as from time to time the Committee deems appropriate to the Board for approval, and monitor compliance with those principles.***

Periodically review the policies and practices of the Company in the area of corporate governance and, as necessary, recommend new policies and changes to existing policies to the Board for its approval. In doing so, the Committee will review with the Company's counsel or other appropriate personnel new and relevant legal and regulatory requirements that may be imposed on the Company from time to time.

***

### D.    Risk Oversight

In coordination with the Audit Committee, assess the Board's role in risk oversight and recommend appropriate disclosures for approval by the Board.

In coordination with the Audit Committee, discuss with management and report to the Board risk management issues related to the matters overseen by the Committee. Specifically, without limitation, the Committee shall discuss and report to the Board the Company's major risk exposures and management's risk monitoring and mitigation activities in connection with: (i) corporate governance; (ii) director succession planning; (iii) political and charitable contributions; (iv) insider trading; and (v) reputational risk to the extent such risk arises from the topics under discussion.

62.    Finally, as stated in the 2017 Proxy, the entire Board is responsible for risk oversight:

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**The Board's Role in Risk Oversight**

The Board oversees the establishment and maintenance of the Company's risk management processes. The Board's role in the Company's risk oversight process includes receiving regular reports from members of senior management on areas of material risk to the Company, ***including operational, financial, clinical, commercial compliance, legal and regulatory, and strategic and reputational risks.*** The full Board (or the appropriate Committee in the case of risks that are under the purview of a particular Committee) receives these reports to enable it to understand the Company's risk profile and the Company's risk identification, risk management and risk mitigation strategies. When a Committee receives the report, the Chairman of the relevant Committee reports on the discussion to the full Board at the next Board meeting. This enables the Board and its Committees to coordinate the risk oversight role.

The Board delegated primary responsibility for oversight of specific risks to its committees. Specifically, the Audit Committee assists the Board in fulfilling its oversight responsibilities with respect to risk management, including in the areas of financial reporting and internal controls, reviews risks associated with product liability insurance, general liability insurance and director and officer insurance and, in coordination with the Compensation Committee, annually reviews the Company's compensation plans, programs and policies as they relate to the Company's risk management. The Compensation Committee is responsible for management of risks relating to the Company's compensation program and policies as well as oversight of other risks associated with the Compensation Committee's responsibilities under its charter. The Nominating and Corporate Governance Committee assists the Board in fulfilling its oversight responsibilities with respect to the management of risks associated with matters overseen by the Nominating and Corporate Governance Committee, including corporate governance, director succession planning, political and charitable contributions, insider trading, and reputational risk to the extent such risk arises from these topics.

(Emphasis added).

63.     The Individual Defendants breached their fiduciary duties by: (i) engaging in and/or causing the Company to engage in questionable practices concerning the sales and marketing of the Company's opioid products; (ii) failing to timely disclose that the Senate Committee had commenced an investigation into the Company's sales and marketing practices in connection with the Company's opioid products; (iii) investing substantial amounts of money in the promotion and re-launch of Nucynta, despite the Individual Defendants' acknowledgment of the risks associated with the promotion of opioid drugs and the heightened legal and regulatory scrutiny associated

with the manufacture, sale and promotion of opioid drugs; (iv) failing to implement and maintain an effective system of internal controls over the Company's practices and procedures with respect to the sale and promotion of its opioid drug products; (v) failing to exercise their oversight duties over the Company's sales and marketing practices with respect to its opioid drug products, including ensuring employees' compliance with all federal, state and local laws, rules and regulations governing the sale and promotion of opioids; (vi) failing to commence an internal investigation into the Company's sales and marketing practices in connection with its opioid drug products after learning of the investigation by the Senate Committee, the DOJ and the Maryland AG; (vii) recommending, authorizing and/or approving severance arrangements with certain of the Individual Defendants that improperly provided for the payment of severance benefits by the Company to certain of the Company's executive officers that voluntarily resigned; (viii) consciously disregarding the risks associated with the promotion and marketing of the Company's opioid products for off-label purposes; (ix) improperly awarding themselves generous and excessive compensation; and (x) reviewing and approving the dissemination of a proxy statement that contained material misrepresentations and/or omissions.

## SUBSTANTIVE ALLEGATIONS

### The United States is Plagued by an Opioid Epidemic

64.     The United States is in the midst of an Opioid epidemic.  According to estimates by the Center for Disease Control ("CDC"), from 2000 to 2015, more than half a million people have died from drug overdoses and approximately 91 Americans die every day from an opioid overdose[2].  The CDC estimates that "[t]he majority of drug overdose deaths (more than six out of ten) involve an opioid."[3]  The CDC further stated that more than 64,000 Americans died from drug overdoses in 2016, amounting to approximately 175 deaths per day.[4]

65.     In response to the foregoing, a number of states have filed lawsuits against opioid manufacturers.  According to an article by the Washington Post dated July 4, 2017, within the past

---

[2] https://www.cdc.gov/drugoverdose/epidemic/index.html
[3] *Id.*
[4] https://www.drugabuse.gov/related-topics/trends-statistics/overdose-death-rates

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1    year, "at least 25 states, cities and counties have filed civil cases against manufacturers, distributors

2    and large drugstore chains that make up the $13 billion-a-year opioid industry."[5] That figure has

3    significantly mushroomed since July 2017.

4          66.    In addition to lawsuits, companies that manufacture opioids are also facing

5    investigations by states' attorneys general and Congressional and Senate investigations.

6    According to an article by CNN published on September 20, 2017, "a coalition of 41 states'

7    attorneys general have served five major opioid manufacturers with subpoenas seeking

8    information about how those companies marketed and sold prescription opioids."[6]  The subpoenas

9    and document requests, which sought information about whether opioid manufacturers may have

10    marketed or distributed their products illegally, were served on pharmaceutical manufacturers

11    Endo International, Janssen Pharmaceuticals, Teva Pharmaceutical Industries Ltd./Cephalon Inc.

12    and Allergan.[7]

13          67.    Further, as discussed in more detail below, on March 28, 2017, U.S. Senator Claire

14    McCaskill, the top-ranking Democrat on the Senate Homeland Security and Government Affairs

15    Committee (the "Senate Committee"), announced that she was opening an investigation into the

16    marketing and sales practices of the nation's top five manufacturers of prescription opioid

17    products, including Depomed (the "Senate Investigation")[8].  According to a statement by

18    McCaskill, "[the] investigation is about finding out whether the same practices that led to this

19    [opioid] epidemic still continue today, and if decisions are being made that harm the public

20    health."[9]  In letters to the manufacturers, McCaskill further stated that "[t]his epidemic is the direct

21    result of a calculated sales and marketing strategy major opioid manufacturers have allegedly

22    pursued over the past 20 years to expand their market share and increase dependency on

23    powerful—and often deadly—painkillers…[t]o achieve this goal, manufactures have reportedly

---

[5]   https://www.washingtonpost.com/investigations/drugmakers-and-distributors-face-barrage-of-lawsuits-over-opioid-epidemic/2017/07/04/3fc33c64-5794-11e7-b38e-35fd8e0c288f_story.html?utm_term=.b321da7af60f

[6] http://www.cnn.com/2017/09/19/health/state-ag-investigation-opioids-subpoenas/index.html

[7] *Id.*

[8]    https://www.hsgac.senate.gov/media/minority-media/breaking-opioid-manufacturers-are-subject-of-new-mccaskill-led-wide-ranging-investigation

[9] *Id.*

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1    sought, among other techniques, to downplay the risk of addiction to their products and encourage

2    physicians to prescribe opioids for all cases of pain and in high doses."[10]  On July 27, 2017, Senator

3    McCaskill stated that she was expanding her investigation to include four additional opioid

4    manufacturers and three opioid distributors.[11]

5        68.     The opioid epidemic has become so severe that on October 26, 2017, President

6    Donald Trump declared the opioid epidemic a national public health emergency.[12]

7    **Background of the Company**

8        69.     Depomed is a specialty pharmaceutical company engaging in the development,

9    sale, and licensing of products focused on pain and other CNS conditions.  The Company's current

10    portfolio includes the following six products marketed in the United States for various pain states:

11        a.     The NUCYNTA® franchise ("Nucynta" or "NUCYNTA") of
12               pain products that the Company acquired in April 2015, which
              includes the following two products:

13             i.     NUCYNTA® ER (tapentadol extended release tablets)
14                   – "a product for the management of pain severe enough
                  to require daily, around-the-clock, long term opioid
15                   treatment, including neuropathic pain associated with
                  diabetic peripheral neuropathy (DPN) in adults, and for
16                   which alternate treatment options are inadequate."

17            ii.     NUCYNTA® IR (NUCYNTA) (tapentadol) – "an
18                   immediate release version of tapentadol for the
                  management of moderate to severe acute pain in adults."

19        b.     Gralise® (gabapentin) – "a once-daily product for the
20               management of postherpetic neuralgia (PHN), that we launched
              in October 2011."

21        c.     CAMBIA® (diclofenac potassium for oral solution) – "a
22               non-steroidal anti-inflammatory drug for the acute treatment of
              migraine attacks that [Depomed] acquired in December 2013."

23        d.     Lazanda® (fentanyl) nasal spray – "a product for the
24               management of breakthrough cancer pain in cancer patients
              18 years of age and older who are already receiving and who
25               are tolerant to opioid therapy for their underlying persistent
              cancer pain, that [Depomed] acquired in July 2013."

26

[10] *Id.*

27 [11] https://www.hsgac.senate.gov/media/minority-media/breaking-mccaskill-opioid-investigation-expands-to-include-distributors-and-additional-manufacturers

28 [12] http://www.cnn.com/2017/10/26/politics/donald-trump-opioid-epidemic/index.html

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

e.      Zipsor® (diclofenac potassium) – "liquid filled capsules, a non-steroidal anti-inflammatory drug for the treatment of mild to moderate acute pain, that [Depomed] acquired in June 2012."

**During the Height of the Opioid Epidemic, Depomed Acquires Nucynta, a "Controlled Substance," and the Individual Defendants Invest Significantly in the Marketing and Re-Launch of Nucynta**

70.     On April 2, 2015, the Company filed a Form 8-K with the SEC announcing that it had recently completed its acquisition of the U.S. rights to the Nucynta franchise of pharmaceutical products:

On April 2, 2015, the Company consummated the transactions (the "Transactions") contemplated by the previously announced Asset Purchase Agreement dated January 15, 2015 with Janssen (the "Asset Purchase Agreement") pursuant to which the Company acquired from Janssen and its affiliates the U.S. rights to the NUCYNTA® franchise of pharmaceutical products (the "Products") as well as certain related assets for $1.05 billion in cash (the "Purchase Price").

71.     On May 11, 2015, the Company filed a current report on Form 8-K with the SEC along with an accompanying press release announcing its financial results and operational achievements for the first quarter ended March 31, 2015.  The press release stated the following, in relevant part:

**Business and Financial Highlights**

- Quarterly product sales for the first quarter of 2015 were $31.7 million, an increase of 47% compared to $21.5 million for first quarter of 2014
- Completed the acquisition of U.S. rights to the NUCYNTA® franchise from Janssen Pharmaceuticals on April 2
- $575 million loan committed in March enabled the rapid close of NUCYNTA transaction:
  - Avoided dilution to shareholders
  - Enhanced sales force recruitment and relaunch preparation
  - Provides financial flexibility to pursue additional acquisitions
- Quarterly net loss of ($11.6 million) or ($0.20) per share
- Quarterly non-GAAP adjusted loss of ($8.0 million) or ($0.13) per share; includes investment of approximately $5 million in the Nucynta deal and one time relaunch expenses during first quarter
- In April, Depomed settled Gralise® ANDA litigation with Actavis, confirming exclusivity to 2024; all ANDA litigation related to Gralise is now resolved

33

72.     With respect to product highlights relating to Nucynta, the press release stated the following:

> NUCYNTA® and NUCYNTA® ER (tapentadol)
>
> - Depomed began fulfilling orders and shipping April 6
> - Quintiles, the contract sales organization that promoted the NUCYNTA franchise for Janssen, continues to support these products for Depomed until relaunch in June
> - Recruitment of Depomed's expanded sales force on target for relaunch in June

73.     The press release also contained a statement by Defendant Schoeneck, who stated the following:

> Depomed is in a period of tremendous growth, on track to become one of the top five companies selling branded pain pharmaceuticals in the US by 2016," said Jim Schoeneck, President and CEO of Depomed. "The products we have acquired over the past three years continue to perform exceptionally well.  Gralise, Cambia and Lazanda delivered strong revenue and prescription growth in first quarter. ***Our experience integrating and growing products will be focused on the relaunch of NUCYNTA in June. With NUCYNTA, we are now expecting 2015 total product sales of $310-$335 million, which is nearly triple our 2014 product sales and over five times 2013 product sales.***
>
> (Emphasis added).

74.     Later that day, the Company hosted an investor conference call to discuss the first quarter 2015 financial results.  With respect to the Nucynta acquisition, defendant Schoeneck discussed the expected increases in the Company's product revenues as a result of the acquisition and the Company's significant expansion of its sales force and stated the following, in relevant part:

> You've heard us talk about transformation over the past couple of years to describe the rapid and continue advancement of Depomed, becoming a leading specialty pharmaceutical company focused on pain and neurology.
>
> The series of strategic and timely transactions have contributed to that transformation, which began in 2011 and the most substantial by far is the one that we announced to complete it this year, the acquisition of the NUCYNTA franchise from Janssen.
>
> The strength of our existing product portfolio, combined with the introduction of our new flagship product NUCYNTA, puts us on track to become one of the top five companies selling branded pain pharmaceuticals in the U.S. by 2016.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

\*\*\*

*Our expertise in integrating and growing products will now be directed at the re-launch of NUCYNTA. The re-launch will feature new product positioning and our marketing campaign that focuses on the products unique mechanism of action.*

\*\*\*

I would like to expand on some of the details of our NUCYNTA transition period. Janssen stop shipping NUCYNTA late March at the end of the fiscal quarter. We closed the transaction April 2nd and we began shipping orders on April 6th. So we will record a full quarter of NUCYNTA sales in Q2.

Further, we implemented a pricing adjustment upon acquisition bringing the monthly cost of NUCYNTA ER to approximately equivalent to OxyContin. We also arranged for Quintiles, the contract sales organization that promoted NUCYNTA for Janssen to continue to support NUCYNTA for Depomed until our relaunch.

*We'll relaunch the product in June with Depomed's expanded sales force totaling more than 270 reps. This total is over three times larger than the Quintiles' sales force currently promoting the product. When we posted our newly created sales positions, we had an overwhelming response.*

\*\*\*

As we move into the rest of 2014 and beyond, we're positioned for tremendous period of growth for the company. The success of our acquisition and commercialization strategy over the past few years has created a base business of pain and neurology products that has delivered year-over-year record sales and we expect that trend to continue.

*We've now added a flagship product, one that we expect to significantly increase Depomed's product revenue, cash flow, EBITDA and adjusted earnings per share for many years to come[13].*

(Emphasis added).

75.     On July 29, 2015, the Company filed a current report on Form 8-K along with an accompanying press release announcing that it had achieved "record sales and cash flow in second quarter 2015" and that it was raising its full year 2015 guidance.  With respect to the Company's business and financial highlights, the press release stated the following, in relevant part:

---

[13]https://seekingalpha.com/article/3171406-depomeds-depo-ceo-jim-schoeneck-on-q1-2015-results-earnings-call-transcript?part=single

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**Business and Financial Highlights Reflect Continued Period of Accelerated Growth**

- Record quarterly net product sales for the second quarter of 2015 were $94.3 million, an increase of 234% compared to $28.2 million for second quarter of 2014 and an increase of 198% compared to $31.7 for first quarter of 2015
- NUCYNTA acquisition completed earlier than expected on April 2, enabling Depomed to record full second quarter NUCYNTA net sales of $56.7 million; product franchise was officially re-launched in mid-June with expanded sales force of 275 plus full marketing and medical support
- Second quarter 2015 cash increase of $55 million positions Depomed to prepay $100 million of secured debt in second quarter 2016
- Quarterly non-GAAP adjusted earnings of $20.0 million, or $0.27 per share
- Quarterly GAAP net loss of ($21.7 million), or ($0.36) loss per share

76.    Additionally, the press release discussed the Company's significant investment in marketing and commercializing Nucynta and the expected increase in sales as a result of its acquisition of Nucynta:

**NUCYNTA has Blockbuster Potential — Commercial Strategy Designed to Achieve Greater Peak Sales than Originally Anticipated**

- Sales force tripled to 275 reps in June; new medical support and speaker program underway
- New positioning focused on dual mechanism of action designed to target both nociceptive and neuropathic pain
- Capturing market share in large and growing markets

  - Over 100 million US patients with chronic pain, 31 million with chronic lower back pain (CLBP)
  - Specific targeting of CLBP patient population
  - Just now being launched for moderate to severe painful diabetic peripheral neuropathy (DPN), which affects another 1-2 million patients

- Managed care dynamics continue to provide broad patient access

  - Effective July 1, 2015, United Healthcare Commercial formulary change benefits NUCYNTA ER; Oxycontin now triple step edit behind NUCYNTA

- Physician education focusing on proper titration/dosing expected to have the potential to increase sales by 50 or more

36

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

- Pricing adjustment now brings NUCYNTA on par with competitors

77. The press release also contained the following statement from defendant Schoeneck:

> Depomed has rapidly become a leading force in the pain and neurology marketplace, with significant net product revenue growth that positions us to continue to deliver substantial value to our shareholders in both the immediate and long term," said Jim Schoeneck, President and CEO of Depomed. "Growth in the second quarter was led by our flagship product NUCYNTA, which had a strong performance in the first quarter of the Company distributing the product. We believe that NUCYNTA has blockbuster potential — an even bigger opportunity than we originally anticipated — and we've just relaunched NUCYNTA with our new product positioning and expanded commercial efforts that we initiated in mid-June. We also see future growth opportunity for Gralise®, Cambia® and Lazanda® including increases in unit demand and market share plus product line extensions. Depomed is now in a period of accelerated growth, one that we see extending well into the future.

78. Later that day, the Company hosted a conference call with investors to discuss Depomed's financial results for the second quarter of 2015. During the call, defendant Schoeneck commented on the "key elements" behind Nucynta's success, including, but not limited to, the Company's significant efforts in promoting Nucynta:

> I'd now like to spend a few minutes on each of these growth opportunities. First and foremost, we believe NUCYNTA has blockbuster potential and can achieve greater peak sales than we originally anticipated.
>
> **There are four key elements to our NUCYNTA plan: one, significantly increased promotion, two, totally revamped product positioning and messaging, three, pricing and access strategies to maximize the brand** and this is new, four, proper dosing. Each has an impact on our sales ramp and the ultimate peak sales potential for NUCYNTA.
>
> Now let me give you some more info on each one. First, promotion. The key component of our strategy is the strength of our sales and marketing force. We officially relaunched NUCYNTA in June with a significantly expanded sales force of 275 highly experienced and specialized pain and neurology reps. **This sales force is over three times larger than the prior sales force and allows us to rapidly and effectively engage to more than 25,000 target prescribers as we raise the profile of NUCYNTA.** Our sales force is fully deployed and energized targeting 8 to 10 prescriber calls per day.
>
> And here is one new observations since our relaunch. There seems to be a group of physicians that have either prescribed NUCYNTA in the

past or prescribe more NUCYNTA than they have recently. This latent demand may turn out to be an additional driver of NUCYNTA as Depomed reengages these physicians[14].

(Emphasis added).

79.     On November 9, 2015, the Company hosted a conference call with investors to discuss Depomed's financial results for the third quarter of 2015 ("Q3 2015").  During the call, defendant Schoeneck updated investors on the Company's significant promotion of Nucynta, and stated the following, in relevant part:

> Let's take a closer look at the four pillars of our NUCYNTA growth structure and our early observations in the market. **First, promotion; as you all know we tripled the size of the NUCYNTA salesforce effort, now promoting NUCYNTA with 277 sales reps. This experienced group is delivering about 10,000 sales calls per week, focusing on high prescribers in our product categories.** Their hard work is already moving NUCYNTA scripts and market share. About four weeks ago, we held sales meetings across the country and I was able to meet with many of our people. They are focused and motivated. We are seeing new physician prescribers of NUCYNTA each week and we are seeing increased prescriptions from existing prescribers. I also believe that these meetings prepared our salesforce to be even more effective in the fourth quarter, as we continue the NUCYNTA re-launch.

(Emphasis added).

80.     On November 13, 2015, the Company filed a current report on Form 8-K along with an accompanying press release announcing that the Company had achieved "record sales" in Q3 2015 and that it was raising its full year 2015 guidance:

- Record net product sales of $105 million, up 242% year-over-year
- NUCYNTA ® net sales of $65 million, up 15% over second quarter
- $52 million increase in cash in third quarter, $107 million for the first six months with NUCYNTA
- Increasing 2015 guidance for product revenue, adjusted non-GAAP earnings and EBI

81.     The press release also stated the following with respect to the Company's increased promotion of Nucynta: "Depomed's first full quarter promoting NUCYNTA complete with its experienced pain and neurology sales force, *over three times more than previous promotional effort.*" (Emphasis added).

[14]     https://seekingalpha.com/article/3381155-depomeds-depo-ceo-jim-schoeneck-on-q2-2015-results-earnings-call-transcript

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

82.     Additionally, the press release contained the following statement from defendant Schoeneck on the Company's Q3 2015 financial results:

> "Depomed is now one of the top U.S. companies in pain and neurology.  In the third quarter, the company achieved historic highs in product sales, driven by significant growth in both prescriptions and market share," said Jim Schoeneck, President and CEO of Depomed. "Our new flagship franchise NUCYNTA, which we began promoting in June, led the way with revenue growing 15% over the prior quarter.  In October, we hit all-time weekly prescription highs for NUCYNTA ER, Gralise and Cambia, reflecting the outstanding work of our sales force across the entire product line.  Depomed increased cash by $107 million in the six months since the close of the NUCYNTA transaction, providing significant financial flexibility to pay down debt and to pursue additional acquisitions, as we continue to create substantial value for shareholders. Based on our financial performance, we are raising 2015 product sales guidance to $336 to $348 million, which is more than triple our 2014 product sales. In addition, we are raising our 2015 non-GAAP adjusted EBITDA to $108 to $116 million, up from our prior guidance of $95 to 110 million and our non-GAAP adjusted earnings to $58 to $66 million, up from our prior guidance of $40 to $50 million. And our 2015 numbers include just three quarters of NUCYNTA revenue.  We believe that we are only at the very beginning of a story with substantial revenue and earnings growth ahead for years to come."

83.     On February 22, 2016, the Company filed a current report on Form 8-K with the SEC along with an accompanying press release announcing that Depomed had achieved "record" financial results for the fourth quarter and fiscal year ended ("FYE") December 31, 2015.  The press release stated the following with respect to the Company's business and financial highlights, in relevant part:

- Record full year net product sales for 2015 were $342 million, an increase of 200% compared to $114 million for full year 2014
- Full year non-GAAP adjusted earnings of $48 million, or $0.70 per share; non-GAAP adjusted earnings includes a reduction of $10 million, or $0.13 cents per share related to the tax treatment of the cebranopadol transaction, which closed in December
- Full year non-GAAP adjusted EBITDA of $111 million
- Fourth quarter 2015 net product sales were a record $111 million, an increase of 228% compared to $34 million for fourth quarter of 2014
- NUCYNTA franchise recorded fourth quarter net sales of $68 million

39

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

84.   With respect to the growth of Nucynta, the press release stated the following, in relevant part:

**Portfolio Delivering Record Prescription Volume**

NUCYNTA (tapentadol and tapentadol extended release) growth continues to accelerate

- Fourth quarter net sales of $68 million, a 55% increase over the $44 million sold by Janssen in fourth quarter 2014
- Net sales of $190 million since acquisition of NUCYNTA on April 2, 2015
- NUCYNTA ER December year-over-year prescription volume growth of 20.7%
- NUCYNTA ER record all-time high prescription volume of over 30,000 reached in December

85.   Later that day, the Company hosted a conference call for investors discussing Depomed's financial results for the 4th quarter and FYE December 31, 2015.  During the call, defendant Schoeneck reiterated the Company's success with respect to promoting Nucynta, and stated the following, in relevant part:

The cornerstone to our NUCYNTA growth strategy is the implementation of our four pillars of growth; promotion, positioning, patient access and proper dosing. ***We've already seen the initial signs of success on the promotion front as the expanded reach of our sales force is gaining traction with high prescribers and influential thought leaders in the pain space. This is evidenced by the increasing number of new prescribers as well as increased prescriptions from existing prescribers. In addition more physicians are prescribing both brands, both immediate release and long acting NUCYNTA.***

***In less than seven months our sales and marketing team executed over 900 speaker programs educating over 10,000 healthcare professionals. Our sales force continues to target approximately 10,000 sales calls per week and is rolling out new marketing material aimed at highlighting NUCYNTA's dual mechanism of action***. Last month our 300 person strong sales team gathered for a national sales meeting. They are committed, energized and unwavering in their desire to grow the portfolio. ***Their 2015 efforts translated into the success with the recent all time prescription highs.*** They also recognize that there's plenty of room for growth. The meeting gave us an opportunity to strengthen their successful playbook with an enhanced set of tools, including new digital and printed marketing materials needed to help take them to the next level.

(Emphasis added).

86.     Additionally, with respect to employees incentives tied to sales of the Company's products, the following exchange occurred between analyst Ami Fadia at UBS and defendant Schoeneck

> **Ami Fadia** - Okay. And then lastly just sort of on your revenue guidance in how you're thinking about top lines for the next 12 months. How are you thinking about balancing between NUCYNTA growth which is extremely important for the next year but also maintaining your base business growth?
>
> **Schoeneck** - So I mean one of the things that we've done from the beginning of the sales force expansion is we have two different types of reps within that sales force. ***We have one group that focuses primarily on pain specialists. They're selling NUCYNTA and NUCYNTA ER and that is by far the largest part of their bonus consideration, their incentive compensation.*** And then behind that they have a smaller amount on Gralise and Zipsor. There is a second group that's about a third of that total group that sells NUCYNTA and NUCYNTA ER, but also Gralise and Cambia. They really are primary carriers of Gralise and their bonus incentive comp is split about equally between the three. So that's part of the way we do that. We got one group that's focused much more on NUCYNTA and NUCYNTA ER and the other that's more focused – that's more balanced between them, really offering support to NUCYNTA, NUCYNTA ER, but really carrying the primary weight for Gralise and there is the sole one selling Cambia.

87.     On May 5, 2016, the Company filed a current report on Form 8-K along with an accompanying press release announcing its first quarter 2016 financial results ("2016 1Q"). With respect to business and financial highlights, the press release stated the following, in relevant part:

**Business and Financial Highlights**

- First quarter 2016 revenues were $105 million, compared to $32 million for first quarter of 2015, a 225% increase
- Record quarterly NUCYNTA® franchise revenue $69 million, up 53% over revenue recorded by Janssen in first quarter 2015
- Quarterly non-GAAP adjusted earnings of $8 million, or $0.12 per share
- Quarterly non-GAAP adjusted EBITDA of $27 million

88.     With respect to Nucynta, the press release stated the following, in relevant part:

**NUCYNTA Franchise Highlights**

NUCYNTA and NUCYNTA ER

- First quarter 2016 net sales of $69 million
- Net sales of $259 million since acquisition on April 2, 2015
- NUCYNTA ER record all-time high prescription volume of approximately 28,800 reached in March

41

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

- NUCYNTA ER March year-over-year prescription growth of 23%

89.     The press release also contained the following statements by defendant Shoeneck:

> "Our NUCYNTA franchise continues to demonstrate strong growth with quarter-over-quarter revenue growth and year-over-year revenue growth of 53%.  The most recent rolling 4-week NUCYNTA ER prescriptions are up 24% over the same period last year, continuing the acceleration we have demonstrated since relaunching the drug.  NUCYNTA IR trends are also positive, with prescription counts in 4 of the last 5 months ahead of the same month in 2015," said Jim Schoeneck, President and CEO of Depomed. "The rest of our product portfolio continued to grow as well, with a combined $35 million in revenue, up 11% over the same quarter last year."

> Continued Mr. Schoeneck: "Moreover, in early April, we reduced our secured debt to $475 million with the early payment of $100 million, underscoring our commitment to deleveraging the Company and strengthening our balance sheet. Revenue during the first quarter of each year is historically lower than the prior quarter due to the reset of patient insurance plan deductibles and changes in wholesaler inventory levels.  Overall, we believe we are well-positioned to accelerate the growth of our NUCYNTA franchise, to continue to advance the rest of our portfolio during the remainder of 2016 and to continue to create value for our shareholders."

90.     Later that day, the Company hosted a conference call for investors to discuss the Company's 2016 1Q financial results.  During the call, defendant Shoeneck stated the following with respect to the promotion of Nucynta, in relevant part:

> We continue to be pleased with the NUCYNTA re-launch. The first quarter saw net sales of our NUCYNTA franchise was $69.4 million. In March, NUCYNTA ER prescriptions reached an all time high of over 28,767 surpassing our previous record set last December and posted a 22.6% year-over-year increase in prescription volumes. The prescription trends continue to accelerate. The most recent data for the week ending April 22 shows a prescription increase of 27.9% as compared to the same week last year.

> While our re-launch strategy is primarily focused on NUCYNTA ER, it is important to note that NUCYNTA IR has also shown favourable prescription trends. Immediately prior to our relaunch, NUCYNTA IR prescription volume was down at 9% year-over-year. Since then we have changed this trend with NUCYNTA IR prescriptions coming in above the prior year levels for four of the past five months.
> Going forward, we believe that NUCYNTA IR prescriptions will grow as we target the appropriate specialist. We are continuing to see progress implementing our four pillars of NUCYNTA growth; promotion, positioning, patient access and proper dosing.

> On a promotion front, we are focused on growing NUCYNTA ER with a pain specialist as well as our Physicians Assistant and Nurse

Practitioners. These two groups write almost 75% of the prescriptions for NUCYNTA ER and the brand is growing faster in these specialties than the rest.

In fact, prior to our re-launch, NUCYNTA ER prescriptions from pain specialists were only growing 1% year-over-year. In March 2016, pain specialist [Indiscernible] 25% over the same month last year and our market share of the long acting opioid prescriptions is now almost 3%.

Since one of the effects of the increased group may on opioid prescribing maybe further concentrations the pain specialist offers. We believe that we are well positioned to continue to accelerate growth.

91.     Additionally, the following exchange took place between analyst David Buck and defendant Schoeneck, in relevant part:

**David Buck** - And just for NUCYNTA, NUCYNTA ER and what impact if any are you seeing just based on the controversy over opioid prescription in general and specifically are you seeing any changes in physician behavior? Thanks.

**Defendant Schoeneck** - And then finally on the NUCYNTA and NUCYNTA ER pieces, you're interested in it if there is lot of activity out there among physicians and lot of talk in terms of what's going on. The activity on the ER side, with the actually change in behavior, scripts are still down about 1% overall, at least the way with the bucket we look at for the long active market.

You certainly have seen more drops than that in OxyContin and to a lesser degree OPANA, but we're still seeing the growth and still seeing the acceleration of the growth. And I think one physician realized that NUCYNTA ER has different properties than the other opioids, particularly when it comes to the kind of activity that CDC and others are most concerned about.

And then I think the other part of it is, because of the risk starting to concentrate more in the pain specialist office, and that's where we have our greatest impact in our greatest market share. So, I think these things actually could play in our favor as we continue to see the acceleration. We're experiencing something very different in some of our peers.

92.     On August 3, 2016, Depomed filed a current report on Form 8-K with the SEC along with an accompanying press release announcing its second quarter 2016 financial results ("2016 2Q").  With respect to the business and financial highlights, the press release stated the following, in relevant part:

**Business and Financial Highlights**
- Second quarter 2016 revenues were $117 million, compared to $95 million for second quarter of 2015, a 23% increase

43

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

- Second quarter NUCYNTA® franchise revenue $72 million, compared to $57 million for second quarter of 2015, a 27% increase
- Quarterly net loss of ($10.5) million or ($0.17) per share
- Quarterly non-GAAP adjusted earnings of $19.8 million, or $0.27 per share
- Quarterly non-GAAP adjusted EBITDA of $42.3 million

93.     Additionally, with respect to Nucynta, the press release stated the following, in relevant part:

**NUCYNTA Franchise Highlights**

NUCYNTA and NUCYNTA ER

- Second quarter 2016 net sales of $72 million
- Net sales of $331 million since acquisition on April 2, 2015
- NUCYNTA ER record all-time monthly high prescription volume of over 29,000 reached in June
- NUCYNTA ER record all-time monthly high market share of long acting opioid market of 1.91% reached in June
- NUCYNTA ER June year-over-year prescription growth of 26%
- First NUCYNTA IR year-over-year quarterly prescription growth since 2011(1)
- NUCYNTA IR May and June year-over-year prescription growth of 2%

94.     Additionally, the press release contained the following statements from defendant Schoeneck, in relevant part:

"The second quarter marked the 1-year anniversary of the mid-June relaunch of our flagship NUCYNTA franchise," said Jim Schoeneck, President and CEO of Depomed. "During the first full year after our relaunch, we delivered $274 million of total NUCYNTA net sales, an increase of 59% over the final year of sales under the previous owner. NUCYNTA ER prescriptions continued to accelerate in June, up 26% over the prior year and achieving all-time high prescription volume and market share. And this is against a backdrop of challenging opioid market conditions that see declining prescriptions for the overall market and other leading brands. We are also encouraged by the positive NUCYNTA IR trends, with May and June showing a 2% prescription volume increase year-over-year, reversing the 10% decline seen before our re-launch. We believe that our flagship franchise is well-positioned for continued growth. The rest of our portfolio also performed well, delivering $45 million in combined revenues, with record quarterly revenues from both Gralise and Lazanda. Going forward we remain focused on growing our highly-differentiated portfolio and delivering value to all the groups we serve."

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

95.     Later that day, the Company hosted a conference call for investors to discuss Depomed's 2016 2Q financial results. During the call, defendant Schoeneck stated the following with respect to Nucynta and the opioid market, in relevant part:

> June marked the one-year anniversary of our NUCYNTA re-launch. In the second quarter the NUCYNTA franchise generated record quarterly net sales of $72 million and has produced $274 million of revenue during the first year of our re-launch, representing a 59% increase over the final year of sales under the previous owner.
>
> In the June NUCYNTA ER prescriptions reached an all-time monthly high of over 29,000, surpassing our previous monthly record set in March. June marked a 26% year-over-year increase in prescription volume, the highest growth rate attained since our re-launch. We continue to see key messages resonating with our target prescribers, new prescriber numbers increasing and all-time high market share for NUCYNTA ER.
>
> Last quarter, we reported NUCYNTA IR had stabilized. And now, during the second quarter 2016 we see encouraging trends producing the first year-over-year quarterly prescription volume increase since 2011. The 10% decrease that we inherited, when we re-launched NUCYNTA IR is now 2% year-over-year growth in back to back months.
>
> We believe that this is just the beginning of an even more positive trend, as our pain-focused sales reps have more time allotted to NUCYNTA IR starting on June 1. I believe that the growth for both NUCYNTA ER and IR is particularly impressive, especially given the backdrop of the opioid market.
>
> The overall market for opioid is down 4% with leading brands declining more rapidly. We fully support the appropriate prescribing of opioids and we believe that tapentadol, the molecule in NUCYNTA may be uniquely positioned to help pain patients and their physicians, while also addressing concerns raised by community leaders and the media.
>
> As we have mentioned before, we have focused on the growth of NUCYNTA IR with four pillars: promotion, positioning, patient access and proper dosing. Let's look at what we have accomplished in the past year, since our re-launch of NUCYNTA.
>
> On the promotion front, we continue to perform well with pain specialists, plus the nurse practitioners and PAs that work with them. Our market share with pain specialists now exceeds 3% of the long-acting opioid market and is almost that high with NPs and PAs. These groups together write about 75% of the NUCYNTA ER prescriptions.
>
> This is even more important when you consider that many primary care physicians are slowing their use of long-acting opioids, and referring

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1  more and more patients to pain specialists where we are much more likely to capture the scripts for NUCYNTA ER.

2  96.   Additionally, during the call, the following exchange took place between defendant

3  Schoeneck and analyst Randall Stanicky:

4  **Randall Stanicky** – Okay.  And then, Jim, I mean, this one is probably
5  for you. When we look at the changed guidance - or maybe, Augie -
   when we look at the updated guidance, is it fair to assume that
   NUCYNTA, lower assumed NUCYNTA revenue outlook for the year
6  is the primary change to that new range?

7  And then, the second part of that would be as we look to the full-year
   it still implies, at the higher end at least, a pretty sharp ramp. Can you
8  help us understand the swing factors, what needs to happen to get to the
   higher end of that revenue range for the year?

9
10                                 ***

11  **Schoeneck** – So, Randall, with respect to that, I think as we look at it I
    would say, NUCYNTA just by the fact that it is our largest overall
    franchise and it's about two-thirds of our sales really is the biggest
12  factor in terms of that change. I mean, some of it is around the opioid
    market, which at the beginning of the year was basically flat to 1% up
13  and is now down 4% to 5% year-over-year. That's the first part.

14  The second is on the dosing level that I mentioned earlier, where we
    had estimated that we would have a slight increase in the dosage per
15  day and now we're actually seeing is it's slightly down. And so, that
    really are the two biggest factors in terms of that change in the guidance
16  range.

17                                 ***

18  **Schoeneck** – I was going to say, in terms of the back-half of the year,
    I mean, we continue to see things accelerate. We've seen things move
19  up. I would point out we have not yet taken a price increase this year
    on NUCYNTA, NUCYNTA ER or Gralise, so we will be looking at a
20  number of avenues that we made due to enhance revenue in the back
    half of the year.

21
22  97.   Additionally, with respect to expanding the Company's sales force in 2017, the

23  following exchange took place between analyst Ami Fadia and defendant Schoeneck:

24  **Ami Fadia** – Got it.  And you previously talked about potentially
    looking into expanding the sales force in 2017 and you said that wanted
25  to review that decision at some point. Is there any update you have
    around that?

26
27  **Schoeneck** – When we do that every year, every year we take a look to
    see are we - is our alignment optimal, do we have the right resource in
    terms of our field personnel, so both in terms of who we're calling and

28

46

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

on the number of people. I mean, one of the interesting things about this market right now, it is constant. It's becoming more concentrated. The pain physicians' offices, some of them that we talk to say, that they're actually overwhelmed with referrals coming in.

And so, I think that's really an opportunity for us, because we have extremely good coverage of that audience. But to answer your question, we will look at that as we do every year. And then make the decision as we through our fall and late New Year budgeting cycle.

98.     On November 7, 2016, the Company filed a current report on Form 8-K along with an accompanying press release with the SEC announcing its third quarter 2016 ("2016 3Q") financial results.  With respect to the business and financial highlights, the press release stated the following, in relevant part:

Business and Financial Highlights

- Third quarter 2016 revenues were $111 million, compared to $105 million for third quarter of 2015, an increase of 5%
- Quarterly net loss of ($12.9) million or ($0.21) per share
- Quarterly non-GAAP adjusted earnings of $20.9 million, or $0.28 per share
- Quarterly non-GAAP adjusted EBITDA of $35.4 million

99.     Additionally, with respect to Nucynta, the press release stated the following, in relevant part:

NUCYNTA Franchise Highlights

- Third quarter 2016 net sales of $65 million
- Net sales of $396 million since acquisition on April 2, 2015
- NUCYNTA ER reached record all-time monthly high prescription volume of over 30,000 reached in August, an increase of 20.4% over August 2015
- NUCYNTA ER reached record all-time monthly high market share of 6.85% of branded long acting opioids and 1.99% of total long acting opioids in September

100.    Finally, the press release contained the following statements by defendant Schoeneck:

"Although our third quarter revenues increased by 5% over the previous year's quarter, they did not meet our expectations, as several factors, including a disconnect between prescription demand and wholesaler shipments, influenced net sales of the NUCYNTA franchise and Gralise.  Prescriptions for NUCYNTA ER grew 4% over the second quarter, while shipments to wholesalers were down 1%.  Prescriptions for NUCYNTA and Gralise were equal to the second quarter, however, shipments were down 6% and 12%, respectively," said Jim Schoeneck, President and CEO of Depomed.

47

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

"In addition, we made adjustments to our reserve accounts, including managed care and PBM rebate submissions from prior quarters, which impacted our product net sales."

Continued Mr. Schoeneck, "For the rest of 2016 and beyond, we are fully committed to continuing the successful relaunch of our NUCYNTA franchise and building prescription demand for our products. For the third quarter, NUCYNTA ER reached all time high monthly market share and total prescriptions, with year-over-year prescription growth of approximately 20%. In addition, the rest of our portfolio achieved revenues of $45 million, an increase of 13% year-over-year. Finally, Depomed's recent NUCYNTA ANDA patent litigation win marked a major milestone for the company, giving us more than 9 years to continue to grow the NUCYNTA franchise, with exclusivity established until December 2025."

101.   Later that day, the Company hosted a conference call for investors to discuss Depomed's 2016 3Q financial results.   During the call, defendant Schoeneck announced the resignation of defendant Shively, and stated the following, in relevant part:

Before I open the call to questions, I have one additional announcement. Effective today, our Chief Commercial Officer, Scott Shively is stepping down and leaving the company. I want to thank Scott for his role in our NUCYNTA expansion relaunch and I wish him well as he continues his career.

***The sale, marketing and managed care functions previously reported to Scott will now report directly to me, which will allow me to work more closely with the commercial team.*** As we analyze our business, optimize our commercial strategies and accelerate the growth of our brands and the company.

(Emphasis added).

102.   Additionally, with respect to the promotion of Nucynta, the following exchange took place between defendant Schoeneck and analyst David Amsellem:

**David Amsellem** – Thanks. So, just a question on the NUCYNTA franchise, and I know you've discussed myriad issues, but just thinking about the sales force and overall marketing and promotion. Do you think that adding new reps is potentially one way or necessary way to drive an uptake in volume growth or is just that's the case where there is just too many headwinds and that just doesn't necessarily make sense.

**Schoeneck** - So David, I think there is two things here. One is really kind of I think the underneath part of your question is about the promotional sensitivity of NUCYNTA and how things are – things respond. One of the things was part of our relaunch strategy, we really focused on with a real hyper-focused on the pain physicians and then the nurse practitioners and PAs that were in those offices. ***I think, as we go forward, we'll be looking to take some of those calls and move***

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

*those in the broader reach.* But we really felt like during the first 18 months or so with launch, we had the broad – we had to really hyper-focus to get the top of the – top of the pyramid, reestablished with NUCYNTA which we've clearly done both in terms of volume and share.

Now that we going to 2017, we'll look to take even our current sales force and the current calls that they may, and makes sure that more of those calls are going to some of the mid-level, if you want to call, I probably shouldn't call it mid-level, because we use that term to call PAs and nurse practitioners, but the deciles in the middle for the primary care physicians really to look at those, to look at drive those and get broader reach. So may make the few less calls in the pain specialist, but we believe, we've got the business we are at, where we can continue to grow it that way, while we expand the reach.

***Certainly more reps could do more with it, I think this is a market that is very large.*** We certainly have a low share, if you look at the share we've got, I mean overall, we are just right at a 2% share of the long-acting market. So we think, there's plenty to grow, and particularly with the differentiating aspects of NUCYNTA has and some of the environment that we are in right now, where I think physicians truly are looking for alternatives.

**David Amsellem** – And then secondly for me taking another, are there any products I mean beyond NUCYNTA where just given delay of the – you may consider pulling back on promotion?

**Schoeneck** - Yeah and it is part of what we do each year, we do an analysis of just that to go, where we're getting return, where we're not, what might it mean, in terms of both our sales force targeting and the call allocation from the sales force. We actually use one of that look like, because the toppers of the industries, we have associates to do that. We're finishing up some of the analysis on that right now and then we'd look – should we want to make changes to do that early next year.

(Emphasis added).

103.   On February 21, 2017, the Company filed a current report on Form 8-K along with an accompanying press release with the SEC announcing its fourth quarter and full year 2016 financial results.  With respect to the business and financial highlights, the press release stated the following, in relevant part:

Business and Financial Highlights

- Record full year net product sales for 2016 were $455 million, an increase of 33% compared to $342 million for full year 2015
- Full year GAAP net loss of ($89) million or ($1.45) per share, which includes a non-cash tax reserve adjustment of ($43) million
- Full year non-GAAP adjusted earnings of $86 million, or $1.15 per share. We are modifying our method of calculating non-GAAP

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

income taxes for non-GAAP adjusted earnings and non-GAAP adjusted earnings per share to align with the guidance under the Non-GAAP Financial Measures Compliance and Disclosure Interpretations issued by the SEC on May 17, 2016.  The amounts above reflect the Company's prior methodology of calculating its non-GAAP income taxes for comparability to prior periods and to the Company's prior guidance for 2016.

- Full year non-GAAP adjusted EBITDA of $156 million
- Fourth quarter 2016 net product sales were a record $124 million, compared to $111 million for fourth quarter of 2015, an increase of 11%
- NUCYNTA franchise reported fourth quarter record net sales of $75 million
- Fourth quarter ending cash and marketable securities was $177 million, cash generated during the quarter was $40 million
- Quarterly GAAP net loss of ($44) million or ($0.72) per share, which includes a non-cash tax reserve adjustment of ($43) million
- Quarterly non-GAAP adjusted earnings of $37 million, or $0.48 per share under the Company's prior method of calculating its non-GAAP income tax expense.
- Quarterly non-GAAP adjusted EBITDA of $51 million

104.    With respect to Nucynta highlights, the press release stated the following, in relevant part:

NUCYNTA® Franchise Highlights

- Full year 2016 record net sales of $281 million
- Fourth quarter 2016 record net sales of $75 million
- Net sales of $471 million since acquisition on April 2, 2015
- NUCYNTA ER® reached record all-time quarterly prescription volume of over 90,000 in fourth quarter
- NUCYNTA ER 2016 total prescriptions of over 344,000, an increase of 19% over 2015
- NUCYNTA ER reached record all-time quarterly market share of 2.08% of total long acting opioids in December
- NUCYNTA reached record all-time quarterly market share of 0.29% in fourth quarter

105.    Additionally, the press release stated the following with respect to the increased promotion of Nucynta and the initiatives undertaken by the Company to accelerate the growth of Nucynta:

Marking a continued commitment to unlock value from its portfolio, in February, the company launched the first of a series of initiatives aimed at driving NUCYNTA growth in 2017 which include:

- Salesforce Deployment: adds 75 reps to Pain sales force for a total of 257, an increase of 41%; Neuro and Oncology sales forces reduced by 70 positions to offset increase; new physician targeting

50

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

emphasizes reimbursement coverage along with prescription volume

- <u>Primary Care Physician Expansion:</u> new salesforce deployment targets more coverage of high decile primary care prescribers
- <u>NUCYNTA ER Diabetic Peripheral Neuropathy (DPN) Indication:</u> highlights indication in category unique to NUCYNTA ER
- <u>NUCYNTA Immediate Release Promotion:</u> introduces a focused, stand-alone promotional campaign for the first time since relaunch
- <u>NUCYNTA Label Expansion Studies</u>: initiating studies aimed at strengthening NUCYNTA's respiratory depression and abuse profiles

106. Additionally, the press release contained the following statements from defendant Schoeneck, in relevant part:

"In 2016, we achieved key milestones strengthening our portfolio and de-leveraging our balance sheet. We ended the year with record annual and quarterly revenue and EBITDA. In addition, we posted all-time net sales highs for every one of our brands," said Jim Schoeneck, President and Chief Executive Officer of Depomed. "Our full-year net revenue reached $456 million, representing a 33% increase over 2015, with quarterly revenue of $124 million, an 11% increase year over year. In addition, we have been successful in growing EBITDA from $7 million in 2014 to $111 million in 2015 and $156 million in 2016. This, along with the early pay down of $100 million of our debt, significantly improves our credit profile and positions us well to refinance. We also built future value into the business as legal victories provided us with 9 more years to grow our flagship NUCYNTA franchise and allowed us to advance our patent infringement case against Purdue."

Continued Mr. Schoeneck, "With the clarity on NUCYNTA's exclusivity until December 2025 and the insights gained since its relaunch, in February we began implementing a multi-faceted growth initiative to increase the appropriate use of NUCYNTA Extended Release and Immediate Release and to drive growth across the portfolio. We continue to focus on opportunities to further differentiate our product portfolio, all with the goal of delivering value to our shareholders and to those we serve."

107. Later that day, the Company hosted a conference call for investors to discuss Depomed's financial results for the fourth quarter and full year 2016. With respect to the promotional campaign for Nucynta, defendant Schoeneck stated the following, in relevant part:

Now, I'll turn back to our commercial and financial performance for last year. Starting with NUCYNTA ER in 2016 we achieved all time record prescription volumes for the brand and grew prescriptions 19% over the prior year. And that was against the challenging and changing backlog in the opioid market.

In 2015, the long acting opioid market was stable compared to the prior year. After the release of the new CDC opioid guidelines in early 2016

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

the market moved suddenly downward with the long acting opioid prescription market ending the year down 5% compared to 2015. We saw daily dosing levels drop as well. Both of these market trends were different than we had anticipated at the beginning of 2016. Even with these headwinds we still saw a significant growth in NUCYNTA ER.

The short acting opioid market acted much the same way with prescriptions down 6% in 2016. NUCYNTA immediate release outperformed the market for the first time in five years with prescriptions in 2016 basically holding steady compared to 2015. Considering that they NUCYNTA IR had seen double-digit decline for four straight years we are pleased with the progress and now look forward to moving the brand to growth in 2017.

In short the new challenges in the marketplace meant that we did not achieve the levels of growth that we had initially expected to see in 2016, get NUCYNTA ER outperform the market by 24% and NUCYNTA IR with 6% about the market.

***

We've learned a lot since the relaunch of NUCYNTA in June of 2015, several things have changed in the opioid market including prescribing trends with some doctors stepping back from the category, changes in dosing levels and reimbursement dynamic. These insides along with nine years of exclusivity for tapentadol allow us to constantly move forward with our 2017 NUCYNTA and portfolio growth initiatives.

There are three prongs in our plan sales force deployment, including revisions to our targeting, our physicians, product messaging initiatives both for NUCYNTA ER and immediate release and label enhancement studies to further differentiate our products.

During the second half of 2016, we engaged the top three consulting firms to asses our commercial effectiveness and to identify opportunities for growth. We then worked with ZS Associates, the industry leader specializing in sales force sizing analysis and targeting analytics to complete a bottom up look at who we are calling on, our sale structure and our deployments. The new targeting and sales force alignment reflect the insights gains surrounding the recent changes in opioid prescribing as well as reimbursement dynamics.

Specifically the new deployment provides us with more effective sales call allocation, broader reach into high prescribing segments while also zeroing in on prescribers with favorable payer dynamics for Depomed products. For example, we only kind of prescriptions sort of prescriber's potential if NUCYNTA or NUCYNTA ER has Tier III or better coverage with the payer. For some doctor this targeting makes a dramatic difference in how we view them.

While they may have the potential to write the category, they may not have a clear path to write our brands. Our efforts are focused on the writers with the best opportunity to prescribe our products for appropriate patients and to increase the odds that those prescriptions are paid and filled.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

With the relaunch of NUCYNTA in June 2015, we first focused on NUCYNTA ER with pain specialist in the key opinion leader community. With last year's publication of the CDC guidelines, as well as other sector pressures this decision prove to be the right one as we've seen more primary care physicians referring their pain patients to pain specialist who along with their nurse partitions and physicians assistance are seeing more patients than ever.

It's important to note that not all primary care physicians have dropped off writing the category and this new targeting initiative is aimed at those who continue to prescribe in our markets. The new targeting leads to changes in our sales force deployment and structure. We've redrawn territory lines, closed some territories and changed the layout of the sales force. As a reminder, our organization is comprised with three groups, pain, neurology and our oncology group that sells Lazanda.

Our pain team has increased to approximately 260 reps from 180. The team is now selling NUCYNTA ER, NUCYNTA immediate release and Gralise, which was formally sold under our Neuro Group. For NUCYNTA ER and NUCYNTA immediate release, this increases the number of sales calls by about 40% compared to 2016 and enables us to go deeper into high decile targets for short-acting opioids. We returned Gralise to the new and larger pain team as there is a large overlap between NUCYNTA ER prescribers and Gralise and we were not seeing the results that we wanted to have from Gralise with our smaller Neuro Group.

\*\*\*

For NUCYNTA immediate release, we are launching a separate promotional campaign aimed at differentiating the product. This is the first time since 2011 that NUCYNTA immediate release will have its own messaging campaign. We believe that this support combined with the increased pain specialist and enhanced targeting, we'll move NUCYNTA immediate release to volume growth. Our sale force is energized by these initiatives and are ready to make 2017 a highly successful year.

108. Additionally, with respect to the expanded sales force, the following exchange took place between analyst Randall Stanicky and defendant Schoeneck:

**Randall Stanicky** – Great, thank you. Hi, guys. I just have a couple of questions if you are looking at the guidance for 2017 it implies about $15 million of revenue increase, which is about 11% and then when I look at recent NUCYNTA scripts they seem to have slightly moderated in recent weeks, and so can you just maybe talk about that and help us calibrate the price volume build into those guidance numbers? And then I have a follow-up.

**Schoeneck** – So, Randall just in general we expect to see NUCYNTA ER scripts up in double-digit and NUCYNTA IR scripts getting into single-digit growth. And so that's what we are in the volume side in addition to seeing some realization of the price increases that we've

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

taken that we took last year. At this point as you know we have not taken a price increase in 2017.

As far as the recent trends around it I think we have been and would expect to go through in this first quarter through some level of disruption as we've moved things around in the sales force. And *we've added 80 people approximately to our pain sales force, which is the group that will really push and move NUCYNTA and NUCYNTA ER and in that group but we've got a number of positional relationships that are now new because of the changes that we've made. And we have some places in the country where we're actually hiring new people.*

So we'd expect as you would see in these situations some level of disruptions with the first three to four months after this redeployment has taken place. And then we would expect to see both the growth coming in and then the benefit of that redeployment happening in the second half of the year.

(Emphasis added).

109.    Additionally, with respect to the performance of Nucynta compared to other opioid drugs, the following exchange took place between analyst Scott Henry and defendant Schoeneck:

**Scott Henry** – So I guess and that kind of leads into the follow-up question. I don't expect NUCYNTA was high on the abuser list and it certainly does fit the profile of an opioid one would abuse, but the negatives of the market have outweighed that profile over the past year? At what point do you think the NUCYNTA profile flips over in terms of that negative into a positive by differentiating it? Is that something you could hope to be have in place by the coming out of '17 and to 2018?

**Schoeneck** – And so, when I think the market of course we do market research, you see that the perception of NUCYNTA is different than the other pure new opioids. You also certainly see differences in the street price and some other things that we've talked about before. And we see that the brands are actually outperforming the market. So NUCYNTA immediate release scripts were flat for the year versus the market that was down 6%. NUCYNTA ER was up 19% against the market that was down 5%.

So we continue to see the brand, but what we are doing on these studies that I mentioned is really to enhance that profile to get the data there and be able to get it hopefully into the label. Now knowing the timeframes for that which includes both doing the clinical work and producing the scientific data and then filing it with the agency I think the effect of those things, the practical effect beyond say publication of some data is more in a 2019 timeframe than a 2018.

54
**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

110.    On February 24, 2017, the Company filed its annual report on Form 10-K with the SEC ("2016 10-K") reiterating its financial results for Fiscal 2016.  The Form 10-K was signed by defendants Schoeneck, Staple, Dawes, Fogarty, Lavigne, Saks, Savage, Tyree and Zenoff.

**The Senate Homeland Security and Government Affairs Committee Opens an Investigation into the Company's Marketing and Promotional Activities for its Opioid Products**

111.    On March 28, 2017, U.S. Senator Claire McCaskill, the top-ranking Democrat on the Senate Homeland Security and Government Affairs Committee, announced that she was opening an investigation into the marketing and sales practices of the nation's top five manufacturers of prescription opioid products, including Depomed (the "Senate Investigation"). The press release stated the following, in relevant part:

> **BREAKING: Opioid Manufacturers are Subject of New McCaskill-Led, Wide-Ranging Investigation**
>
> **Tuesday, March 28, 2017**
>
> **WASHINGTON** – Opioid manufacturers will be the subject of a new, wide-ranging investigation being launched by U.S. Senator Claire McCaskill, the top-ranking Democrat on the Senate Homeland Security and Governmental Affairs Committee. McCaskill is requesting information from the manufacturers of the nation's top five prescription opioid products by 2015 sales, including sales and marketing materials, internal addiction studies, details on compliance with government settlements and donations to third party advocacy groups.
>
> The investigation will explore whether pharmaceutical manufacturers—at the head of the opioids pipeline—have contributed to opioid overutilization and overprescription as overdose deaths in the last fifteen years have approached nearly 200,000. According to the Centers for Disease Control and Prevention, deaths from opioids, including prescription opioids and heroin, reached over 30,000 in 2015 alone, and sales of prescription opioids have quadrupled since 1999.
>
> "I hear it everywhere I go—drug overdose deaths, the vast majority of them related to prescription opioids or heroin, are single-handedly destroying families and communities across Missouri and the country, and I refuse to just stand by and watch—we have an obligation to everyone devastated by this epidemic to find answers," McCaskill said. "All of this didn't happen overnight—it happened one prescription and marketing program at a time. The vast majority of the employees, executives, sales representatives, scientists, and doctors involved with this industry are good people and responsible actors, but some are not. This investigation is about finding out whether the same practices that led to this epidemic still continue today, and if decisions are being made that harm the public health."

55

In letters to the heads of Purdue, Janssen/Johnson & Johnson, Insys, Mylan, and Depomed, McCaskill requested:

- Documents showing any internal estimates of the risk of misuse, abuse, addiction, overdose, diversion or death arising from the use of any opioid product or any estimates of these risks produced by third-party contractors or vendors.
- Any reports generated within the last five years summarizing or concerning compliance audits of sales and marketing policies.
- Marketing and business plans, including plans for direct-to-consumer and physician marketing, developed during the last five years.
- Quotas for sales representatives dedicated to opioid products concerning the recruitment of physicians for speakers programs during the last five years.
- Contributions to a variety of third party advocacy organizations.
- Any reports issued to government agencies during the last five years in accordance with corporate integrity agreements or other settlement agreements.

"This epidemic is the direct result of a calculated sales and marketing strategy major opioid manufacturers have allegedly pursued over the past 20 years to expand their market share and increase dependency on powerful—and often deadly—painkillers," McCaskill wrote. "To achieve this goal, manufactures have reportedly sought, among other techniques, to downplay the risk of addiction to their products and encourage physicians to prescribe opioids for all cases of pain and in high doses."

112.    That same day, multiple media outlets, such as USA Today, CNN and The Wall Street Journal, published articles reporting on the Senate Investigation.[15]  Despite the foregoing news reports discussing the Senate Investigation and naming Depomed as one of the few companies that was under investigation, the Individual Defendants failed to timely disclose the Senate Investigation until August 7, 2017, nearly 5 months later.

**Certain of the Individual Defendants Cause the Company to Issue Materially False and Misleading Statements and/or Omissions While Continuing to Heavily Promote Nucynta in the Wake of the Senate Investigation**

113.    On May 9, 2017, the Company filed a current report on Form 8-K along with an accompanying press release with the SEC announcing its first quarter 2017 ("2017 1Q") financial

---

[15]   See   https://www.usatoday.com/story/news/politics/2017/03/28/sen-claire-mccaskill-opens-probe-opioid-drugmakers/99702506/;   http://www.cnn.com/2017/03/28/health/senate-opioid-manufacturer-investigation/index.html;   https://www.wsj.com/articles/senator-mccaskill-begins-probe-of-prescription-opioid-marketing-1490718934.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

results.  With respect to the business and financial highlights, the press release stated the following,

in relevant part:

**Business and Financial Highlights**

- First quarter 2017 GAAP revenues were $90 million, impacted by a one-time $4.7 million Managed Care rebate charge. Non-GAAP revenues were $95 million excluding the charge
- First quarter ending cash and marketable securities was $195 million, an increase of $17 million during the quarter
- Quarterly GAAP net loss of ($27) million or ($0.43) per share
- Quarterly non-GAAP adjusted earnings of $4 million, or $0.07 per share
- Quarterly non-GAAP adjusted EBITDA of $25 million
- Early repayment of $100 million of secured debt in April 2017

114.   The Company also announced a series of strategic initiatives undertaken by the

Company and stated the following, in relevant part:

**Strategic Initiatives Aimed at Driving Sustainable Portfolio Growth**

The Company today is announcing a series of initiatives aimed at driving growth and increasing efficiencies in the business.

Improved Salesforce Alignment: the Company has implemented the following adjustments to its recent salesforce realignment. Importantly, the overall headcount of the salesforce will not be impacted.

Pain Team*: the Pain salesforce, which was recently increased from 190 to 258, will remain at 258 and continue to carry NUCYNTA ER and NUCYNTA IR as their primary focus.* Gralise has been reassigned to the Neurology team where it will receive proper focus. *Call plan targets will be optimized to ensure Pain Specialists are sufficiently covered given their increasing importance in this market.*

(Emphasis added).

115.   Finally, the press release contained the following statements by defendant Higgins,

in relevant part:

"I am excited to have joined Depomed and am confident in our future," said Arthur Higgins, President and Chief Executive Officer of Depomed. "We are currently facing a number of challenges in our business and they are reflected in our first quarter performance which fell well short of expectations.  During my first month on the job, I have worked across the Company to diagnose our recent performance.  The key drivers of our first quarter shortfall include: significant declines in the opioid market and a highly disruptive salesforce realignment which was implemented in February."

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Mr. Higgins continued: "Despite these challenges, Depomed has a valuable set of differentiated assets and, as a team, we are working rapidly to address the issues within our control.  We are in the process of implementing a number of actions that are compatible with market realities and the promotional needs of our products.  These initiatives should have an impact in the coming quarters as we stabilize the business and look to exit the year well positioned to drive sustainable long-term growth and shareholder value."

116.    On May 10, 2017, the Company filed a quarterly report on Form 10-Q with the SEC reiterating its 2017 1Q financial results for the quarterly period ended March 31, 2017 ("2017 1Q 10-Q").  Notably absent from the 2017 1Q 10-Q was any mention that the Company had recently received a letter from Senator Claire McCaskill, the top-ranking Democrat on the Senate Homeland Security and Governmental Affairs Committee, inquiring about Depomed's marketing strategy with respect to Nucynta and its other opioid medications.

**The Company Finally Announces the Senate Investigation and Reveals that it Received Subpoenas from the Office of the Attorney General of Maryland ("Maryland AG") and the United States Department of Justice ("DOJ")**

117.    On August 9, 2017, the Company filed a quarterly report on Form 10-Q with the SEC announcing its financial results for the second quarter of 2017 for the quarterly period ended June 30, 2017 (the "2017 2Q 10-Q").  The 2017 2Q 10-Q stated the following, in relevant part:

*Opioid-Related Request and Subpoenas*

*The Company and a number of other pharmaceutical companies recently received a request for information from the ranking minority member of the United States Senate Committee on Homeland Security and Governmental Affairs related to the promotion of opioids.* The Company has voluntarily furnished information responsive to such request.

The Company and a number of other pharmaceutical companies recently received subpoenas related to opioid sales and marketing from the Office of the Attorney General of Maryland and the United States Department of Justice.  The Company is currently cooperating with the State of Maryland and the Department of Justice in their respective investigations.

118.    The foregoing statement was false and misleading because, as discussed above, the Senate Committee commenced its investigation into Depomed's promotional practices in March 2017 through the sending of a letter from Senator McCaskill dated March 28, 2017, more than 5

months before the filing of the 2017 2Q 10-Q.  As discussed below, the Company and the Individual Defendants have repeatedly acknowledged the risks associated with, among other things, complying with the rules and regulations governing controlled substances and off-label promotions and the potential material adverse effect on the Company's financials in the event the Company is found to have engaged in off-label promotional activities.  Accordingly, the Individual Defendants breached their fiduciary duties by failing to timely disclose the Senate Investigation and for causing the Company to falsely misrepresent that the Company "recently received" a request from the Senate Committee seeking information related to the promotion of opioids.

119.    Later that day, the Company filed a current report on Form 8-K along with an accompanying press release with the SEC reiterating its financial results for the second quarter of 2017 and stating the following, in relevant part:

**Business and Financial Highlights**

- Second quarter 2017 revenues were $100 million, broadly in line with our estimates
- Second quarter ending cash and marketable securities was $117 million, an increase of $26 million during the quarter after prepayment of $100 million of secured debt and an associated $4 million prepayment fee
- Quarterly GAAP net loss of ($27) million or ($0.43) per share
- Quarterly non-GAAP adjusted earnings of $5 million, or $0.08 per share
- Quarterly non-GAAP adjusted EBITDA of $28 million
- Instituted corporate governance updates to further align shareholder interests and corporate governance best practices
- Increasing Neurology salesforce effective September 1

120.    Additionally, the press release contained the following statements by defendant Higgins, in relevant part:

*"Our second quarter product revenue was broadly in line with our expectations,"* said Arthur Higgins, President and CEO of Depomed. "We continue to operate in an environment that is challenging and rapidly evolving.  The increasing public focus on opioids as well as opioid manufacturers, including by government agencies and other industry stakeholders, will continue to disrupt the opioid markets.  *While our flagship NUCYNTA franchise continues to outperform the long and short-acting markets*, it is clearly not immune to these developments.  *Despite these challenges we continue to see opportunities to develop a leadership position in the treatment of pain* by working with all stakeholders to encourage the appropriate

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

prescribing and use of opioids. As a company, we remain committed to serving the pain management needs of patients and their physicians."

(Emphasis added).

121.    Also on August 7, 2017, the Company hosted a conference call for investors to discuss its financial results for the second quarter of 2017.  During the call, defendant Higgins made the following statements with respect to the opioid market, in relevant part:

It is clear we are operating in a challenging and volatile environment. You only have to turn on the television or read the newspaper to understand that opioid injection and the resulting overdoses and deaths are a national crisis.

Recently the new FDA commissioner Scott Gottlieb called the opioid epidemic the biggest crisis facing the FDA. Janet Yellen, Chairman of the Federal Reserve called the opioid epidemic a threat to the U.S. labor force. And the commission on combining drug addiction and opioid abuse led by Governor Chris Christie asked the President Trump last week to declare it a national emergency.

Also last week the FDA announced plans to expand the existing long-acting REMS program to include immediate release for acting opioids. We're also seeing governmental stakeholders question the role of drugmakers, wholesalers and prescribers in this space. To that end, on July 28 we received the subpoena from the Department of Justice regarding our commercialization practices for our NUCYNTA products and Lazanda.

Similar inquiries have been made to other pharmaceutical companies in the opioid space and we as a company look forward to cooperating with this request. As you know I'm relatively new to Depomed and Depomed is relatively new to the opioid space having only launched NUCYNTA IR, we launched NUCYNTA IR and ER in 2015.

Since that time many things have changed but one constant is that the company has always been committed to operating according to the highest standards of compliance, ethics and patient care and I can assure you these standards will continue under my watch.

Not surprisingly and we feel justifiably this environment has significantly impacted the overall opioid market. In the second quarter, the long-acting and short-acting market showed a year-over-year decline of approximately 11% and 7% respectively. ***Against this background, we were able to continue to grow our market share of our NUCYNTA franchise and deliver companywide revenue of $100.4 million which is broadly in line with our expectations.***

(Emphasis added).

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

122.     With respect to the Company's promotional activities, the following exchange took place between analyst David Amsellem and defendant Higgins:

> **David Amsellem** – And then in terms of the overall portfolio, I mean, you talked about, Lazanda and halting promotion there. Are there any other products you can envision also discontinuing active promotion?

> **Higgins** – No, I think we see that a role for all the products that are in our portfolio with Lazanda, we are supporting that product with non-field force promotion. We're talking about probably less than a hundred key prescribers are carrying for 75% of that business. So we'll look to that through non-promotion. *But as regard to rest of the portfolio, we have no intention of changing our efforts behind those products.*

> (Emphasis added).

123.     On September 12, 2017, the Company gave a presentation at the Morgan Stanley 2017 Global Healthcare Conference.  During the presentation, the following exchange occurred between analyst David Risinger, defendant Higgins and non-defendant Augie Moretti, the Company's CFO:

> **David Risinger** – Okay, very good.  And then in terms of the investigation, the government is obviously quite upset about the opioid epidemic. But do you provide any update on things on your side?

> **Higgins** – Let me add in and you can jump in.  And I mean, I think, first of all, we are relatively new entrant into the opioid space. *Two and a half years, that time when we entered the market we are already aware of the heightened scrutiny.*

> So our compliance programs, we believe, are very comprehensive. So we're pretty confident that whatever questions were asked by government agencies or states or any other body, we have appropriate answers. It's just unfortunate that there is a lot of scrutiny and it's not selective. It's going to be in the space gets tagged. And so that we've been tagged.

> *Again I want make it clear we're not uncomfortable with any of the promotional practices, and we're pretty confident we can answer any questions [indiscernible] or does bring incremental legal costs.* But, again, Augie, you can comment on that.

> **Augie Moretti** – Right, just on that point, when we did revise our guidance on our last conference call and we increased, *we took the range of our SG&A expense up $4 million for the remainder of the year to cover both the expansion* and the neurology sales force, but also the cost of complying with the various increase that we've received. So to address them, we did respond in full to the request we received from Senator McCaskill, the *her committee issued an initial report last week related to another manufacturer we were referenced in that.*

61

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

> We're complying with the Department of Justice inquiry and also requests from the attorney general in Maryland and requests that we received that in the last week of August from the attorney general of Missouri and the attorney general of New Jersey. Again, I would echo what Arthur said and what we believe that our compliance programs have been very robust, and we are hopeful that we will be able to satisfy the all of these inquiries without any efforts impact on us.

(Emphasis added).

124.   The Individual Defendants breached their fiduciary duties by: (i) engaging in and/or causing the Company to engage in questionable practices concerning the sales and marketing of the Company's opioid products; (ii) failing to timely disclose that the Senate Committee had commenced an investigation into the Company's sales and marketing practices in connection with the Company's opioid products; (iii) investing substantial amounts of money in the promotion and re-launch of Nucynta, despite the Individual Defendants' acknowledgment of the risks associated with the promotion of opioid drugs and the heightened legal and regulatory scrutiny associated with the manufacture, sale and promotion of opioid drugs; (iv) failing to implement and maintain an effective system of internal controls over the Company's practices and procedures with respect to the sale and promotion of its opioid drug products; (v) failing to exercise their oversight duties over the Company's sales and marketing practices with respect to its opioid drug products, including ensuring employees' compliance with all federal, state and local laws, rules and regulations governing the sale and promotion of opioids; (vi) failing to commence an internal investigation into the Company's sales and marketing practices in connection with its opioid drug products after learning of the investigation by the Senate Committee, the DOJ and the Maryland AG; (vii) recommending, authorizing and/or approving severance arrangements with certain of the Individual Defendants that improperly provided for the payment of severance benefits by the Company to certain of the Company's executive officers that voluntarily resigned; (viii) consciously disregarding the risks associated with the promotion and marketing of the Company's opioid products for off-label purposes; (ix) improperly awarding themselves generous and excessive compensation; and (x) reviewing and approving the dissemination of a proxy statement that contained material misrepresentations and/or omissions.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**Starboard Value LP, the Company's Second Largest Shareholder, Attempts to Replace the Board**

125.    On May 26, 2016, Starboard Value LP ("Starboard"), the Company's second largest shareholder, filed a proxy statement on Schedule 14A with the SEC announcing that it was seeking to call a special meeting of shareholders for removing and replacing the directors who were serving on the Board at the time and replace them with a modified slate of "six highly qualified director nominees."  The proxy statement stated the following, in relevant part:

> **STARBOARD    DELIVERS    LETTER    TO    DEPOMED SHAREHOLDERS**
>
> ***Recommences the Process to Call a Special Meeting of Shareholders for Removing and Replacing the Current Depomed Board with a Modified Slate of Six Highly Qualified Nominees***
>
> ***Intends to Submit Today a New Record Date Request Notice to Depomed and File Preliminary Proxy Materials with the SEC for Soliciting Requests to Call a Special Meeting***
>
> ***Reiterates Significant Concerns Regarding Serious Corporate Governance Deficiencies, Questionable Capital Allocation Decisions, and Egregious Actions by the Board to Stymie Strategic Interest***
>
> **NEW YORK, NY** May 26, 2016 /PRNewswire/ -- Starboard Value LP (together with its affiliates, "Starboard"), one of the largest shareholders of Depomed, Inc. (NASDAQ: DEPO) with an ownership interest in approximately 9.9% of Depomed's outstanding shares, today announced it has delivered an open letter to Depomed shareholders and intends to recommence the process for calling a Special Meeting of Depomed shareholders for removing and replacing the current Depomed Board of Directors with a modified slate of six highly qualified director nominees.
>
> The full text of the letter follows:
>
> May 26, 2016
>
> Dear Fellow Shareholders,
>
> Starboard Value LP, together with its affiliates ("Starboard"), currently has an ownership interest in approximately 9.9% of the outstanding shares of Depomed, Inc. ("Depomed" or the "Company"), making us one of the Company's largest shareholders.
>
> We believe that Depomed is deeply undervalued and significant opportunities exist within the control of management and the Board of Directors (the "Board") to unlock substantial value for the benefit of all shareholders. ***Unfortunately, as we outlined in our previous letter to Depomed on April 8th, we have significant concerns regarding***

*serious corporate governance deficiencies, questionable capital allocation decisions, and egregious actions taken by the Board to stymie strategic interest in acquiring Depomed.  We believe the Board clearly lacks the independence, objectivity, and perspective needed to make decisions that are in the best interests of shareholders.*

To that end, we will be delivering to Depomed today a new written request, in accordance with Depomed's Bylaws, that the Board set a record date for determining the shareholders entitled to call a special meeting (the "Record Date Request Notice") for purposes of seeking to remove and replace the current Board.  This Record Date Request Notice supersedes our initial request delivered to Depomed, dated April 7, 2016 (the "Initial Record Date Request Notice").  As you may recall, the Initial Record Date Request Notice was delivered to Depomed in order to preserve our rights under California law and mitigate the risk that Depomed would seek to further amend its governance provisions to suppress shareholder rights.

Since delivering the Initial Record Date Request Notice, we have undertaken an extensive process to carefully vet a slate of highly-qualified nominees that included the evaluation of over 100 qualified potential candidates.  We have selected a group of six candidates possessing unique skill sets and perspectives directly relevant to Depomed's business and current challenges, including pharmaceutical operations, healthcare regulatory, finance, board governance and oversight, and mergers and acquisitions expertise.  Collectively, our slate of director nominees has decades of experience serving on well-performing public company boards.  Importantly, this group of nominees, if elected at the special meeting, is prepared to serve the shareholders of Depomed and ensure that the interests of all shareholders are of paramount importance.

We appreciate that the Board promptly set a record date in response to our Initial Record Date Request Notice, thereby demonstrating that it does not intend to unnecessarily delay the calling of a special meeting by shareholders. While we also appreciate the Board's intentions in amending its 10% poison pill rights plan ("Poison Pill") to facilitate our delivery of the requisite requests from shareholders in order to call the special meeting, there are other considerations as a 13D filer that make us uncomfortable with the idea of soliciting and delivering requests from other Depomed shareholders without conducting a public solicitation.  Therefore, today we are filing preliminary proxy materials with the SEC in furtherance of soliciting the requisite requests to deliver the special meeting request.  Our expectation is that the Board will adhere to a similar timetable in setting a record date for this Record Date Request Notice as it did with our Initial Record Date Request Notice, and we look forward to calling a special meeting of shareholders in the near future.

We are confident that you will find the team of professionals we are nominating to be incredibly well-qualified to serve as directors of Depomed.  We have provided detailed biographies of each of our nominees below.  Over the coming weeks and months, we intend to

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1                         share our detailed views on Depomed and look forward to engaging
with you as we approach the special meeting of shareholders.

2        126.    At the time of the filing of the proxy statement by Starboard, the following six

3 individual defendants were serving on the Board of Depomed: defendants Dawes, Lavigne, Saks,

4 Shoeneck, Zenoff and Staple.

5        127.    On October 19, 2016, the Company filed a current report on Form 8-K with the

6 SEC announcing that on October 17, 2016, Depomed had entered into a settlement agreement with

7 Starboard ("Settlement Agreement").  As a result of the Settlement Agreement, the Company,

8 among other things: (i) increased the size of the Company's Board by three directors to nine

9 directors such that there would be three vacancies on the Board and (ii) appointed defendants

10 Fogarty, Savage and Tyree to fill the newly created vacancies, effective as of October 17, 2016.

11        128.    On March 29, 2017, the Company filed a current report on Form 8-K with the SEC

12 announcing, among other things, that on March 28, 2017: (i) defendant Schoeneck resigned as

13 President, CEO and director of the Board; (ii) defendant Higgins entered into a letter agreement

14 with the Company pursuant to which Higgins would serve as President and CEO of the Company

15 and as a director of the Company, effective immediately; (iii) defendants Saks and Zenoff resigned

16 as directors of the Board, effective immediately; (iv) defendants Molinelli and McKee were

17 appointed to serve as directors on the Board; and (v) defendant Staple resigned as independent

18 Chairman of the Board and defendant Fogarty was appointed independent Chairman of the Board.

19  **Certain of the Individual Defendants Recommended and/or Approved Generous and Excessive**

20 **Severance Payments and Benefits that were Inconsistent with the Terms of the Management Continuity Agreements**

21        129.    On February 19, 2016, the Company filed a current report on Form 8-K with the

22 SEC announcing, among other things, that on February 12, 2016, the Board "amended and restated

23 the form of Management Continuity Agreement previously entered into with the Company's

24 executive officers."  The Form 8-K stated the following, in relevant part:

25           ***Amended and Restated Management Continuity Agreements***

26           On February 12, 2016, the Board of Directors amended and restated the
form of Management Continuity Agreement previously entered into
with the Company's executive officers to, among other things,

27           (i) provide that certain severance benefits payable upon a termination
following a change in control will be made in a lump sum and

28

(ii) extend the protection period following a change in control to provide that such severance benefits may become payable upon certain involuntary terminations that occur within twenty-four months (rather than twelve months) following a change in control. The form of Management Continuity Agreement, as amended and restated (the "Amended and Restated Management Continuity Agreement") is to be entered into with each of the Company's executive officers and replaces and supersedes the Management Continuity Agreements previously entered into by the Company and such officers.

130.    On February 26, 2016, the Company filed an annual report on Form 10-K with the SEC disclosing the Company's financial results for the fiscal year ended December 31, 2015 (the "2015 10-K").   Attached as Exhibit 10.18 to the Form 10-K was the Amended and Restated Management Continuity Agreement (the "Management Continuity Agreement").   Paragraph 1(a) of the Management Continuity Agreement stated the following, in relevant part:

1.    **At-Will Employment; Term**

(a)      The Company and Employee acknowledge that Employee's employment is and shall continue to be at-will, as defined under applicable law, and that Employee's employment with the Company may be terminated by either party at any time for any or no reason. ***If Employee's employment terminates for any reason, Employee shall not be entitled to any payments, benefits, damages, award or compensation other than as provided in this Agreement or otherwise agreed to by the Company.*** The terms of this Agreement shall terminate upon the earlier of: (i) the date on which Employee ceases to be employed by the Company, other than as a result of a Change in Control Involuntary Termination or an Other Involuntary Termination, or (ii) the last day of the Term (such date being referred to herein as the "End Date"; provided, however, that in the event of a Pending Change in Control in effect on the End Date, the End Date shall be delayed until the later to occur of (x) the termination of any Pending Change in Control by the parties to such Pending Change in Control and (y) one year after the completion of any Pending Change in Control). Notwithstanding the foregoing, in no event shall this Agreement terminate prior to the time that all outstanding obligations of the parties hereunder have been satisfied. A termination of the terms of this Agreement pursuant to this Section 1(a) shall be effective for all purposes, except that such termination shall not affect the payment or provision of compensation or benefits on account of a termination of employment occurring prior to the termination of the terms of this Agreement. The rights and duties created by this Agreement are contingent upon the Employee's execution of a release of claims against the Company, in substantially the form attached hereto as *Appendix A,* within forty-five (45) days following his termination of employment and the expiration of any statutory revocation period and may not be modified in any way except by a written agreement executed by the Employee and an officer of the Company upon direction from the Board of Directors.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

(Emphasis added).

131.    In the event that an employee is terminated due to a change in control, paragraph 2(a) of the Management Continuity Agreement states that the employee is entitled to receive the following, in relevant part:

2.    **Termination Benefits.**

(a)    **Benefits Upon a Change in Control Involuntary Termination.**

(i)    Treatment of Equity Awards.  In the event that Employee is subject to a Change in Control Involuntary Termination, 100% of Employee's unvested Company option shares, restricted stock, restricted stock units and other equity-based awards shall become immediately vested on such termination date and the risk of forfeiture of 100% of Employee's restricted stock shall lapse on such termination date.  Each such equity award shall be exercisable in accordance with the provisions of the award agreement and plan pursuant to which such equity award was granted, including, in the case of stock options, the plan or award agreement provisions regarding any post-termination period of exercisability.

(ii)    Severance.  In the event that Employee is subject to a Change in Control Involuntary Termination, Employee shall be entitled to receive severance benefits as follows:  (A) a lump sum cash severance payment equal to **[one (1) times (*if Employee is not the CEO*)] [two (2) times (*if Employee is the CEO*)]** the higher of (1) the base salary which Employee was receiving immediately prior to the Change in Control or (2) the base salary which Employee was receiving immediately prior to the Change in Control Involuntary Termination, which payment shall be paid on the sixtieth (60th) day following the Change in Control Involuntary Termination; (B) a lump sum cash payment equal to **[one (1) times (*if Employee is not the CEO*)] [two (2) times (*if Employee is the CEO*)]** Employee's Target Annual Bonus; and (C)  payment by the Company of the full cost of the health insurance benefits provided to Employee and Employee's spouse and dependents, as applicable, immediately prior to the Change in Control pursuant to the terms of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA") or other applicable law through the earlier of the end of the **[twelve (12) month (*if Employee is not the CEO*)] [twenty-four (24) month (*if Employee is the CEO*)]** period following the Change in Control Involuntary Termination date or the date upon which Employee is no longer eligible for such COBRA or other benefits under applicable law.  The benefits to be provided under clauses (a)(i) and (a)(ii) shall be paid on the sixtieth (60th) day following Employee's termination of employment ; except that any payments under clause (a)(ii)(C) shall be paid on a monthly basis commencing on the sixtieth (60th) day following Employee's termination of employment (subject in all cases to Employee's release of claims against the Company as set forth in Section 1(a)).  Notwithstanding the foregoing, in the event the Board

of Directors concludes in its reasonable judgment that the provision of subsidized COBRA benefits to Employee is likely to cause the Company to become subject to excise tax as a result of the Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act of 2010 (the "Healthcare Reform Act"), the Company shall pay Employee a monthly amount in cash equal to the amount of the COBRA subsidy during the period the Company is obligated to provide subsidized COBRA benefits to Employee. In addition, Employee shall receive payment(s) for all salary, bonuses and unpaid vacation accrued as of the date of Employee's termination of employment and up to three (3) months of outplacement services not to exceed $5,000 per month (with a provider and in a program selected by the Employee. provided Employee commences such services within ninety (90) days of Employee's Change in Control Involuntary Termination date).

132.     In the event that an employee is terminated due to an "Other Involuntary Termination[16]," paragraph 2(b) of the Management Continuity Agreement states that the employee is entitled to receive the following, in relevant part:

(b)     **Benefits Upon an Other Involuntary Termination**.

*[Item (i) - if Employee is CEO only]*

(i)     Treatment of Equity Awards.  In the event that Employee is subject to an Other Involuntary Termination, Employee shall be credited with an additional twelve (12) months of employment for purposes of determining the vesting of his equity-based awards, which shall result in the immediate vesting as of such termination date of those otherwise unvested Company option shares, restricted stock, restricted stock units and other equity-based awards that would have become vested if Employee had completed an additional twelve (12) months of employment following such termination date and the risk of forfeiture of Employee's applicable number of restricted stock, restricted stock units and similar equity-based awards shall lapse on such termination date. Each such equity award shall be exercisable in accordance with the provisions of the award agreement and plan pursuant to which such equity award was granted, including, in the case of stock options, the plan or award agreement provisions regarding any post-termination period of exercisability.

---

[16] Paragraph 3(g) defines "Other Involuntary Termination" as "(i) any termination by the Company other than for Cause, death or Disability, or (ii) Employee's voluntary termination for Good Reason (as defined in this Section 3(g)), in each case, excluding a Change in Control Involuntary Termination. For purposes of this Section 3(g), "Good Reason" shall mean that Employee has complied with the "Good Reason Process" following the occurrence of any of the following events: (i) a ten percent (10%) or greater decrease in Employee's annual total cash compensation target (annual base salary plus annual bonus target) other than in connection with a general decrease in the total annual cash compensation target (annual base salary plus annual bonus target) for most officers of the Company and the successor corporation, if applicable; or (ii) a change in the geographic location at which Employee provides services to the Company that increases the Employee's one-way commute by twenty-five (25) miles or more."

(ii)    <u>Severance</u>.  In the event that Employee is subject to an Other Involuntary Termination, Employee shall be entitled to receive severance benefits as follows:  (A) severance payments for **[twelve (12) months (*if Employee is a SVP*)] [eighteen months (18) (*if Employee is the CEO*)]** after the effective date of the termination (for purposes of this Section 2(b)**[(i)][(ii)]**, the "<u>Severance Period</u>") equal to the base salary which Employee was receiving immediately prior to the Other Involuntary Termination, which payments shall be paid during the Severance Period in accordance with the Company's standard payroll practices; and (B)  payment by the Company of the full cost of the health insurance benefits provided to Employee and Employee's spouse and dependents, as applicable, immediately prior to the Other Involuntary Termination pursuant to the terms of COBRA or other applicable law through the earlier of the end of the Severance Period or the date upon which Employee is no longer eligible for such COBRA or other benefits under applicable law.  The benefits to be provided under Section 2(b)(i)[ and 2(b)(ii)] shall be paid or commence to be paid on the sixtieth (60th) day following Employee's termination of employment (subject to Employee's release of claims against the Company as set forth in Section 1(a)).  Notwithstanding the foregoing, in the event the Board of Directors concludes in its reasonable judgment that the provision of subsidized COBRA benefits to Employee could cause the Company to become subject to excise tax as a result of the Patient Protection and Affordable Care Act, as amended by the Healthcare Reform Act, the Company shall pay Employee a monthly amount in cash equal to the amount of the COBRA subsidy during the period the Company is obligated to provide subsidized COBRA benefits to Employee.  In addition, Employee shall receive payment(s) for all salary, bonuses and unpaid vacation accrued as of the date of Employee's termination of employment and up to three (3) months of outplacement services not to exceed $5,000 per month (with a provider and in a program selected by the Company, provided Employee commences such services within ninety (90) days of Employee's Other Involuntary Termination date).

133.    In the event that the employee is terminated for cause, paragraph 2(c) of the Management Continuity Agreement states that the employee is entitled to receive the following payments and/or benefits from the Company:

(c)    **Termination for Cause**.  If Employee's employment is terminated for Cause at any time, ***then Employee shall not be entitled to receive payment of any severance benefits or equity award acceleration.***  Employee shall receive payment(s) for all salary, bonuses and unpaid vacation accrued as of the date of Employee's termination of employment.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

134.   In the event that the employee voluntarily resigns from the Company, paragraph 2(d) of the Management Continuity Agreement states that the employee is entitled to receive the following payments and/or benefits from the Company:

> (d)   **Voluntary Resignation**.  If Employee voluntarily resigns from the Company under circumstances which do not constitute a Change in Control Involuntary Termination or an Other Involuntary Termination, then Employee shall not be entitled to receive payment of any severance benefits or equity award acceleration.  Employee shall receive payment(s) for all salary, bonuses and unpaid vacation accrued as of the date of Employee's termination of employment.

**Resignation of Defendant Shively**

135.   On November 8, 2016, the Company filed a current report on Form 8-K with the SEC announcing that defendant Shively had resigned as SVP and CCO of the Company.  The Form 8-K stated the following, in relevant part:

> ***On November 4, 2016, R. Scott Shively, the Senior Vice President and Chief Commercial Officer of Depomed, Inc. (the "Company") resigned as an officer of the Company, effective as of that date.***  In connection with the termination of his employment with the Company, ***pursuant to his Management Continuity Agreement with the Company*** effective February 12, 2016 and a release of claims executed in connection with his termination:  ***(i) Mr. Shively will receive twelve months of base salary and health insurance benefits, and is eligible for three months of outplacement services; and (ii) 15,625 of the restricted stock units held by Mr. Shively will vest as scheduled on December 1, 2016*** (or, in the Company's discretion and in lieu of the vesting of such restricted stock units, the Company may elect to make a cash payment to Mr. Shively equal to the product of 15,625 and the closing sale price of the Company's common stock on December 1, 2016).  The release of claims becomes effective on November 11, 2016 and is revocable by Mr. Shively until that date pursuant to applicable employment law.

(Emphasis added).

136.   As stated above, the Management Continuity Agreement states that in the event that an employee voluntarily resigns from the Company, "Employee shall not be entitled to receive payment of any severance benefits or equity award acceleration.  Employee shall receive payment(s) for all salary, bonuses and unpaid vacation accrued as of the date of Employee's termination of employment."  Despite publicly stating that defendant Shively had resigned from the Company which, according to the Management Continuity Agreement, would not entitle him

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

to receive any severance benefits, the Board and/or the Compensation Committee, in breach of their fiduciary duties, still determined to award defendant Shively severance benefits and payments.   During the time of defendant Shively's resignation, defendants Fogarty, Dawes, Lavigne, Savage, Staple, Tyree, Saks, Schoeneck and Zenoff were serving on the Board, and defendants Dawes, Fogarty, Saks and Zenoff were serving on the Compensation Committee.

**Resignation of Schoeneck**

137.   On March 29, 2017, the Company filed a current report on Form 8-K with the SEC announcing that on March 28, 2017, defendant Schoeneck had resigned as President and CEO and director of the Company.  The Form 8-K stated the following, in relevant part:

> ***On March 28, 2017, the Company announced the <u>resignation</u> of James Schoeneck as President and Chief Executive Officer of the Company and as a Director on the Board.***  The Company and Mr. Schoeneck entered into a Waiver and Release Agreement (the "<u>Waiver and Release Agreement</u>") in connection with Mr. Schoeneck's resignation. Mr. Schoeneck's resignation is not due to a disagreement with the Company on any matter relating to the Company's operations, policies or practices.
>
> ***Under the terms of the Waiver and Release Agreement, the Company has agreed to pay Mr. Schoeneck (i) $825,000, which is equal to 12 months of his current base salary, payable in equal installments in accordance with the Company's ordinary payroll practices, (ii) the full cost of the health insurance benefits provided to Mr. Schoeneck, his spouse and dependents, as applicable, pursuant to the terms of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended (" <u>COBRA</u> ") or other applicable law through the earlier of (a) the end of the 12 month period following the date of the Waiver and Release Agreement or (b) the date on which Mr. Schoeneck is no longer eligible for such COBRA or other benefits under applicable law and (iii) up to six months of documented, bona fide, outplacement services not to exceed $5,000 per month.***  Pursuant to the Waiver and Release Agreement Mr. Schoeneck has agreed to forfeit all of his outstanding stock options (whether vested or unvested) and unvested restricted stock units granted to him under the Company's equity compensation plans (as in effect from time to time). The Waiver and Release Agreement also includes a standard a non-disparagement covenant, confidentiality covenant, as well as a release of claims.

138.   The Waiver and Release Agreement was attached as Exhibit 10.2 to the Company's quarterly report filed on Form 10-Q with the SEC on May 10, 2017.  Notably, the Waiver and Release Agreement stated that defendant Schoeneck and the Company "waive any rights that the

71

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Parties may have under Schoeneck's Offer Letter, dated April 3, 2011 (the 'Offer Letter'), the Management Continuity Agreement between Schoeneck and the Company, dated February 12, 2016 (the 'Management Continuity Agreement'), Schoeneck's equity notices of award and award agreements with the Company and any of the Company's involuntary severance benefit plans…"

139.   As stated above, the Management Continuity Agreement states that in the event that an employee voluntarily resigns from the Company, "Employee shall not be entitled to receive payment of any severance benefits or equity award acceleration.  Employee shall receive payment(s) for all salary, bonuses and unpaid vacation accrued as of the date of Employee's termination of employment."  Despite publicly stating that defendant Schoeneck had resigned from the Company which, according to the Management Continuity Agreement, would not entitle him to receive any severance benefits, the Board and/or the Compensation Committee, in breach of their fiduciary duties, still determined to award defendant Schoeneck severance benefits and payments.  During the time of defendant Schoeneck's resignation and the signing of the Waiver and Release Agreement[17], defendants Fogarty, Dawes, Lavigne, Savage, Staple, Tyree, Saks, Schoeneck and Zenoff were serving on the Board, and defendants Dawes, Fogarty, Saks and Zenoff were serving on the Compensation Committee.

**Resignation of Rao**

140.   On July 7, 2017, the Company filed a current report on Form 8-K with the SEC announcing that on June 30, 2017, the Company entered into an agreement with defendant Rao pursuant to which Rao will resign as SVP and CMO of the Company, effective July 31, 2017.  The Form 8-K stated the following, in relevant part:

> On June 30, 2017, Depomed, Inc. (the "Company") entered into an agreement with Srinivas G. Rao, M.D., Ph. D., the Company's Senior Vice President and Chief Medical Officer, **pursuant to which Dr. Rao will _resign_ as an officer of the Company**, effective as of July 31, 2017, or such other date as may be mutually agreed upon between Dr. Rao and the Company.  In connection with the termination of his employment with the Company, and pursuant to his release of claims executed in connection with his termination, **Dr. Rao will receive a**

[17] According to the publicly filed Waiver and Release Agreement, defendant Schoeneck signed the agreement on March 26, 2017.  Thus, it can be reasonably inferred that any negotiations and/or approval of the severance benefits paid to Schoeneck took place on or before March 26, 2017.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

*lump sum cash payment equal to his current annual base salary, a lump sum cash payment equal to a pro-rata portion of the annual bonus he would have earned for 2017 based on actual performance of the Company over the entire year (payable in 2018 at the same time annual bonuses are paid to executives generally), and Company-paid health insurance benefits for a period of twelve months.  Dr. Rao will also be eligible for three months of outplacement services.*

(Emphasis added).

141.    Defendant Rao's Waiver and Release Agreement was attached as Exhibit 10.2 to the Company's quarterly report filed on Form 10-Q with the SEC on August 7, 2017.  Notably, the Waiver and Release Agreement stated that defendant Rao "acknowledge[s] and agree[s] that [Rao is] not entitled to any payments or benefits pursuant to [Rao's] management continuity agreement with Depomed, Inc., effective as of February 12, 2016 (the "Management Continuity Agreement"), in connection with the termination of [Rao's] employment with the Company, and that payment of the Benefits described above shall be the sole severance compensation [Rao] will receive in connection with such termination of employment."

142.    As stated above, the Management Continuity Agreement states that in the event that an employee voluntarily resigns from the Company, "Employee shall not be entitled to receive payment of any severance benefits or equity award acceleration.  Employee shall receive payment(s) for all salary, bonuses and unpaid vacation accrued as of the date of Employee's termination of employment."  Despite publicly stating that defendant Rao had resigned from the Company which, according to the Management Continuity Agreement, would not entitle him to receive any severance benefits, the Board and/or the Compensation Committee, in breach of their fiduciary duties, still determined to award defendant Rao severance benefits and payments.  During the time of defendant Rao's resignation, defendants Fogarty, Dawes, Higgins, Lavigne, McKee, Molinelli, Savage, Staple and Tyree were serving on the Board, and defendants McKee, Molinelli, Savage and Staple were serving on the Compensation Committee.

**THE CURRENT DIRECTOR DEFENDANTS CAUSE DEPOMED TO ISSUE A MATERIALLY FALSE AND MISLEADING PROXY STATEMENT**

143.    On July 14, 2017, the Company filed the 2017 Proxy with the SEC announcing that the Company's Annual Meeting of Shareholders ("Annual Meeting") would be held on August 15, 2017, during which shareholders would be asked to, among other things, "approve, on an advisory basis, the compensation of the Company's named executive officers."   In the Compensation Discussion and Analysis section of the 2017 Proxy, the Company stated the following, in relevant part:

> In connection with this ongoing review, the Compensation Committee continues to revise the executive compensation program to implement and maintain what it believes to be are best practices with respect to executive compensation. The Company's executive compensation corporate governance framework includes the following practices, each of which reinforces our executive compensation objectives:
>
> ***
>
> ***Management Continuity Agreements*** entered into with each of our executive officers provide for double trigger severance benefits meaning that ***both a change in control and termination of employment are required for severance benefits to be paid…***

(Emphasis added).

144.    The foregoing statements are materially false and misleading because as discussed in detail above and as evidenced by the Company's public filings with the SEC, the Current Director Defendants reviewed, authorized and/or approved the payment of severance benefits to defendants Schoeneck, Shively and Rao that were inconsistent with the terms of the foregoing defendants' Management Continuity Agreements, given that Schoeneck, Shively and Rao each received severance benefits despite there being no change in control and that the foregoing defendants voluntarily resigned, as opposed to being "terminated."

**The Individual Defendants were Aware of the Opioid Epidemic, the Increased Regulatory Scrutiny of Opioid Manufacturers and the Risks Associated with Off-Label Promotions**

145.    As set forth above, the majority of the Individual Defendants, including the Current Director Defendants, have substantial experience in the pharmaceutical industry. As such, the

74

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Current Director Defendants had a duty to implement and oversee effective internal controls over the Company's marketing and sales practices with respect to its opioid drug products.  This is especially true given the Company's recognition that Depomed may incur significant liability if it is determined that the Company is promoting or has previously promoted the "off-label" use of drugs.

146.    Specifically, the Company included the following risk factors in its 2017 2Q 10-Q, and substantially similar risk factors in its annual and quarterly reports dating back to at least May 11, 2015[18]:

> ***If we do not successfully commercialize NUCYNTA® ER and NUCYNTA® IR (NUCYNTA), our largest selling products, or Gralise®, CAMBIA®, Zipsor® and Lazanda®, our business, financial condition and results of operations will be materially and adversely affected.***
>
> In April 2015, we acquired and began commercial promotion of NUCYNTA ER and NUCYNTA. In October 2011, we began commercial sales of Gralise. In June 2012, we acquired Zipsor and began commercial promotion of Zipsor in July 2012. In July 2013, we acquired Lazanda and began commercial promotion of Lazanda in October 2013. In December 2013, we acquired CAMBIA and began commercial promotion of CAMBIA in February 2014. As a Company, we have a limited history of selling and marketing pharmaceutical products. In addition to the risks discussed elsewhere in this section, our ability to successfully commercialize and generate revenues from NUCYNTA ER and NUCYNTA, our largest selling products, or Gralise, CAMBIA, Zipsor and Lazanda, depends on a number of factors, including, but not limited to, our ability to:
>
> - develop and execute our sales and marketing strategies for our products;
> - achieve, maintain and grow market acceptance of, and demand for, our products;
> - obtain and maintain adequate coverage, reimbursement and pricing from managed care, government and other third-party payers
> - maintain, manage or scale the necessary sales, marketing, manufacturing, managed markets, and other capabilities and infrastructure that are required to successfully integrate and commercialize our products;
> - maintain and extend intellectual property protection for our products; and
> - comply with applicable legal and regulatory requirements.

---

[18] The same or substantially similar risk factors also appeared in the Company's 2016 10-K, which was signed by defendants Schoeneck, Staple, Dawes, Fogarty, Lavigne, Saks, Savage, Tyree and Zenoff, five out of seven of the Current Director Defendants.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

If we are unable to successfully achieve or perform these functions, we will not be able to maintain or increase our product revenues and our business, financial condition and results of operations will be materially and adversely affected. Further, if we are unable to maintain or increase our revenues from NUCYNTA ER and NUCYNTA, our largest selling products which generated approximately 62% of our total product revenues in 2016, and approximately 64% of our total product revenues for the six months ended June 30, 2017, our business, financial condition and results of operations will be materially and adversely affected.

***

***Changes in laws and regulations applicable to and investigations of, the pharmaceutical industry, including the opioid market, may adversely affect our business, financial condition and results of operations.***

The manufacture, marketing, sale, promotion and distribution of our products are subject to comprehensive government regulation. Changes in laws and regulations applicable to the pharmaceutical industry could potentially affect our business. For instance, federal, state and local governments have recently given increased attention to the public health issue of opioid abuse. The Centers for Disease Control (CDC) recently issued national, non-binding guidelines on the prescribing of opioids, providing recommended considerations for primary care providers when prescribing opioids, including specific considerations and cautionary information about opioid dosage increases and morphine milligram equivalents (MME). Certain third-party payers are, or are considering, adopting these CDC guidelines. In July 2017, the Pharmaceutical Care Management Association, a trade association representing pharmacy benefit managers, wrote a letter to the commissioner of FDA in which it expressed support for, among other things, the CDC guidelines and a seven-day limit on the supply of opioids for acute pain. In addition, states, including the Commonwealth of Massachusetts and the States of New York, Ohio and New Jersey, have either recently enacted or have pending legislation or regulations designed to among other things, limit the duration and quantity of initial prescriptions of immediate release form of opiates and mandate the use by prescribers of prescription drug databases. Also, at the state and local level, a number of states and major cities have brought separate lawsuits against various pharmaceutical companies marketing and selling opioid pain medications, alleging misleading or otherwise improper promotion of opioid drugs to physicians and consumers. In addition, the attorneys general from several states have announced the launch of a joint investigation into the marketing and sales practices of drug companies that market opioid pain medications. These and other similar initiatives and actions, whether taken by governmental authorities or other industry stakeholders, may result in the reduced prescribing and use of opioids, including NUCYNTA and NUCYNTA ER, which could adversely affect our business, financial condition and results of operations.

At the federal level, the White House Office of National Drug Control Policy continues to coordinate efforts between the FDA, the U.S. Drug

76

Enforcement Agency (DEA) and other agencies to address this issue. The DEA continues to increase its efforts to hold manufacturers, distributors, prescribers and pharmacies accountable through various enforcement actions as well as the implementation of compliance practices for controlled substances. In addition, many state legislatures are considering various bills intended to reduce opioid abuse, for example by establishing prescription drug monitoring programs and mandating prescriber education. Further, the FDA is requiring "black-box" warnings on immediate release opioids highlighting the risk of misuse, abuse, addiction, overdose and death. In addition, during the 2016 presidential campaign, President Trump called for the DEA to restrict the amount of opioids that can be manufactured in the U.S. In March 2017, President Trump announced the creation of a commission to make recommendations to the president regarding new laws and policies to combat opioid addiction and abuse. In August 2017, the commission issued a preliminary report calling on President Trump to officially declare the crisis of opioid abuse a national emergency. These and other changes, and potential changes in laws, regulations and industry practices including those that have the effect of reducing the overall market for opioids or reducing the prescribing of opioids, could adversely affect our business, financial condition and results of operations.

***Heightened attention on the problems associated with the abuse of opioids could adversely affect our business, financial condition and results of operations.***

In recent years, there has been increased public attention on the problem of opioid abuse. The ability of drug abusers to discover previously unknown ways to abuse and misuse opioid products; public inquiries and investigations into prescription drug abuse; litigation and heightened regulatory activity regarding the sales, marketing, distribution or storage of opioid products, among other things, could cause additional unfavorable publicity regarding the use and misuse of opioids, which could have a material adverse effect on our products and our reputation. Such negative publicity could reduce the potential size of the market for our products and product candidate and decrease the revenues we are able to generate from their sale. Additionally, such increased scrutiny of opioids generally, whether focused on our products or otherwise, could have the effect of negatively impacting our relationships with healthcare providers and other members of the healthcare community, reducing the overall market for opioids or reducing the prescribing and use of our products.

***Governmental investigations and inquiries as well as regulatory actions with respect to the commercialization and use of opioids could adversely affect our business, financial condition and results of operations.***

As a result of the greater public awareness of the problem of opioid abuse, there has been increased scrutiny of, and investigation into, the commercial practices of opioid manufacturers generally by federal, state and local regulatory and governmental agencies. For example, we were named as a defendant in a case brought by the City of Chicago against a number of pharmaceutical companies marketing and selling

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

opioid based pain medications, alleging misleading or otherwise improper promotion of opioid drugs to physicians and consumers. This case against the Company was dismissed.  We recently received a letter from Senator Claire McCaskill, the Ranking Member on the United States Senate Committee on Homeland Security and Governmental Affairs, requesting certain information from the Company regarding its commercialization of opioid products.  We have voluntarily furnished information responsive to Sen. McCaskill's requests.  We recently received an Administrative Subpoena from the Office of the Attorney General of Maryland seeking documents and information regarding the sales and marketing of opioid products. We are currently cooperating with the State of Maryland in its investigation.  We recently received a subpoena from the United States Department of Justice (DOJ) seeking documents and information regarding the sales and marketing of opioid products.  We are currently cooperating with the DOJ in its investigation.

These and other governmental investigations or inquiries in which we may become involved may result in claims being brought against the Company by governmental agencies or private parties. It is not possible at this time to predict the outcome of any governmental investigations or inquiries of the Company or any lawsuits or regulatory responses that may result from such investigations or inquiries or otherwise. However, the initiation of any investigation, inquiry or lawsuit relating to the Company, or any assertion, claim or finding of wrongdoing by the Company, could:

- adversely affect our business, financial condition and results of operations;
- result in reputational harm and reduced market acceptance and demand for our products;
- harm our ability to market our products;
- cause us to incur significant costs and expenses; and
- cause our senior management to be distracted from execution of our business strategy.

Furthermore, governmental regulators could take measures that could have a negative effect on the Company's business.  For example, Endo Pharmaceuticals, Inc. recently voluntarily withdrew, at the FDA's request, OPANA® ER from the market due to the FDA's view that the risks associated with the use of the product outweighed the potential benefits. Any negative regulatory request or action taken by a regulatory agency, including the FDA, with respect to NUCYNTA or NUCYNTA ER would adversely affect our business, results of operations and financial condition.

\*\*\*

***Pharmaceutical marketing is subject to substantial regulation in the U.S. and any failure by us or our collaborative partners to comply with applicable statutes or regulations could adversely affect our business.***

All marketing activities associated with NUCYNTA ER, NUCYNTA, Gralise, CAMBIA, Zipsor and Lazanda, as well as marketing activities

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

related to any other products that we may acquire, or for which we obtain regulatory approval, will be subject to numerous federal and state laws governing the marketing and promotion of pharmaceutical products. The FDA regulates post-approval promotional labeling and advertising to ensure that they conform to statutory and regulatory requirements. In addition to FDA restrictions, the marketing of prescription drugs is subject to laws and regulations prohibiting fraud and abuse under government healthcare programs. For example, the federal healthcare program anti-kickback statute prohibits giving things of value to induce the prescribing or purchase of products that are reimbursed by federal healthcare programs, such as Medicare and Medicaid. In addition, federal false claims laws prohibit any person from knowingly presenting, or causing to be presented, a false claim for payment to the federal government. Under this law, in recent years, the federal government has brought claims against drug manufacturers alleging that certain marketing activities caused false claims for prescription drugs to be submitted to federal programs. Many states have similar statutes or regulations that apply to items and services reimbursed under Medicaid and other state programs, and, in some states, such statutes or regulations apply regardless of the payer. If we, or our collaborative partners, fail to comply with applicable FDA regulations or other laws or regulations relating to the marketing of our products, we could be subject to criminal prosecution, civil penalties, seizure of products, injunctions and exclusion of our products from reimbursement under government programs, as well as other regulatory actions against our product candidates, our collaborative partners or us.

***We may incur significant liability if it is determined that we are promoting or have in the past promoted the "off-label" use of drugs.***

Companies may not promote drugs for "off-label" use—that is, uses that are not described in the product's labeling and that differ from those approved by the FDA. Physicians may prescribe drug products for off-label uses, and such off-label uses are common across some medical specialties. Although the FDA and other regulatory agencies do not regulate a physician's choice of treatments, the FDCA and FDA regulations restrict communications on the subject of off-label uses of drug products by pharmaceutical companies. The Office of Inspector General of the Department of Health and Human Services (OIG), the FDA, and the Department of Justice (DOJ) all actively enforce laws and regulations prohibiting promotion of off-label use and the promotion of products for which marketing clearance has not been obtained. Such liabilities would harm our business, financial condition and results of operations as well as divert management's attention from our business operations and damage our reputation.

***

***Any failure by us or our partners to comply with applicable statutes or regulations relating to controlled substances could adversely affect our business.***

Each of NUCYNTA ER and NUCYNTA are opioid analgesics that contain tapentadol. Lazanda is an opioid analgesic that contains fentanyl. Cebranopadol is a development stage opioid analgesic.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Tapentadol and fentanyl are regulated "controlled substances" under the CSA. The CSA establishes, among other things, certain registration, production quotas, security, recordkeeping, reporting, import, export and other requirements administered by the DEA. The DEA regulates controlled substances as Schedule I, II, III, IV or V substances, with Schedule II substances being those that present the highest risk of abuse. Each of tapentadol and fentanyl are listed by the DEA as a Schedule II substance under the CSA. The scheduling for cebranopadol will not be determined until after the FDA's approval. The manufacture, shipment, storage, sale and use, among other things, of controlled substances that are pharmaceutical products are subject to a high degree of regulation. For example, generally all Schedule II substance prescriptions, such as prescriptions for fentanyl, must be written and signed by a physician, physically presented to a pharmacist and may not be refilled without a new prescription.

The DEA also conducts periodic inspections of certain registered establishments that handle controlled substances. Facilities that conduct research, manufacture, distribute, import or export controlled substances must be registered to perform these activities and have the security, control and inventory mechanisms required by the DEA to prevent drug loss and diversion. Failure to maintain compliance, particularly non-compliance resulting in loss or diversion, can result in regulatory action that could adversely affect our business, results of operations and financial condition. The DEA may seek civil penalties, refuse to renew necessary registrations, or initiate proceedings to restrict, suspend or revoke those registrations and in certain circumstances, violations could lead to criminal proceedings against us or our manufacturing and distribution partners, and our respective employees, officers and directors.

In addition to federal regulations, many individual states also have controlled substances laws. Although state controlled substances laws generally mirror federal law, because the states are separate jurisdictions they may separately schedule our products. Any failure by us or our partners to obtain separate state registrations, permits or licenses in order to be able to obtain, handle and distribute fentanyl or to meet applicable regulatory requirements could lead to enforcement and sanctions by the states in addition to those from the DEA or otherwise arising under federal law and could adversely affect our business, results of operations and financial condition.

147.   Thus, given the foregoing, the Individual Defendants had a duty to remain apprised of the rules and regulations governing the manufacturing and promotion of controlled substances and should have been diligent in monitoring employees' compliance with the foregoing.  Yet, the Individual Defendants breached their fiduciary duties by: (i) engaging in and/or causing the Company to engage in questionable practices concerning the sales and marketing of the Company's opioid products; (ii) failing to timely disclose that the Senate Committee had

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

commenced an investigation into the Company's sales and marketing practices in connection with the Company's opioid products; (iii) investing substantial amounts of money in the promotion and re-launch of Nucynta, despite the Individual Defendants' acknowledgment of the risks associated with the promotion of opioid drugs and the heightened legal and regulatory scrutiny associated with the manufacture, sale and promotion of opioid drugs; (iv) failing to implement and maintain an effective system of internal controls over the Company's practices and procedures with respect to the sale and promotion of its opioid drug products; (v) failing to exercise their oversight duties over the Company's sales and marketing practices with respect to its opioid drug products, including ensuring employees' compliance with all federal, state and local laws, rules and regulations governing the sale and promotion of opioids; (vi) failing to commence an internal investigation into the Company's sales and marketing practices in connection with its opioid drug products after learning of the investigation by the Senate Committee, the DOJ and the Maryland AG; (vii) recommending, authorizing and/or approving severance arrangements with certain of the Individual Defendants that improperly provided for the payment of severance benefits by the Company to certain of the Company's executive officers that voluntarily resigned; (viii) consciously disregarding the risks associated with the promotion and marketing of the Company's opioid products for off-label purposes; (ix) improperly awarding themselves generous and excessive compensation; and (x) reviewing and approving the dissemination of a proxy statement that contained material misrepresentations and/or omissions.

## DAMAGES TO DEPOMED CAUSED BY THE INDIVIDUAL DEFENDANTS

148.   As a direct and proximate result of the Individual Defendants' misconduct, the Individual Defendants allowed for materially inadequate controls over the Company's policies and practices, caused the company to issue materially false and misleading statements at all relevant times herein, and substantially damaged the Company's credibility, corporate image and goodwill.

149.   Depomed has expended and will continue to expend significant sums of money. Additional expenditures and  damages that the Company has incurred as a result of the Individual Defendants' breaches of their fiduciary duty include:

      a.    Costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to Depomed;

      b.    Costs and fees spent on improper and/or illegal marketing and sales practices with respect to the Company's opioid drug products;

      c.    Costs incurred from investigating, defending and paying any settlement or judgment in connection with the Securities Class Action for violations of federal securities laws and governing accounting principles;

      d.    Costs incurred in connection with the investigation being conducted by the United States Senate Committee on Homeland Security and Governmental Affairs, and possible fines and/or penalties based on the Senate Committee's findings;

      e.    Costs incurred in connection with the investigation being conducted by the Office of the Attorney General of Maryland, and possible fines and/or penalties based on the Maryland AG's findings;

      f.    Costs in connection with the investigation being conducted by the DOJ, and possible fines and/or penalties based on the DOJ's findings; and

      g.    Costs incurred from the loss of Depomed's customers' confidence in the Company's services.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

150.    Plaintiff brings this action derivatively in the right and for the benefit of Depomed to redress injuries suffered, and to be suffered, by Depomed as a direct result of the Individual Defendants' multiple breaches of fiduciary duty.

151.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

152.    Depomed is named as a nominal defendant in this case solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have. Plaintiff is and was a shareholder of Depomed at the time of the transgressions complained of. Plaintiff will adequately and fairly represent the interests of Depomed and its

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

shareholders in enforcing and prosecuting their rights.  Prosecution of this action, independent of the current Board of Directors, is in the best interests of the Company.

153.    The wrongful acts complained of herein subject, and will continue to subject, Depomed to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

154.    The wrongful acts complained of herein were unlawfully concealed from Depomed's shareholders.

155.    At all relevant times herein, the Individual Defendants violated multiple corporate governance principles, thus representing evidence of the Individual Defendants' breaches of fiduciary duties, which included: (i) engaging in and/or causing the Company to engage in questionable practices concerning the sales and marketing of the Company's opioid products; (ii) failing to timely disclose that the Senate Committee had commenced an investigation into the Company's sales and marketing practices in connection with the Company's opioid products; (iii) investing substantial amounts of money in the promotion and re-launch of Nucynta, despite the Individual Defendants' acknowledgment of the risks associated with the promotion of opioid drugs and the heightened legal and regulatory scrutiny associated with the manufacture, sale and promotion of opioid drugs; (iv) failing to implement and maintain an effective system of internal controls over the Company's practices and procedures with respect to the sale and promotion of its opioid drug products; (v) failing to exercise their oversight duties over the Company's sales and marketing practices with respect to its opioid drug products, including ensuring employees' compliance with all federal, state and local laws, rules and regulations governing the sale and promotion of opioids; (vi) failing to commence an internal investigation into the Company's sales and marketing practices in connection with its opioid drug products after learning of the investigation by the Senate Committee, the DOJ and the Maryland AG; (vii) recommending, authorizing and/or approving severance arrangements with certain of the Individual Defendants that improperly provided for the payment of severance benefits by the Company to certain of the Company's executive officers that were inconsistent with the terms of the executive officers'

Management Continuity Agreements; (viii) consciously disregarding the risks associated with the promotion and marketing of the Company's opioid products for off-label purposes; and (ix) improperly awarding themselves generous and excessive compensation.

156.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Current Director Defendants to institute this action since such demand would be a futile and useless act because the Current Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action. The wrongful acts complained of herein show a wholesale abandonment by the Individual Defendants, including the Current Director Defendants, of their fiduciary duties of loyalty, due care and oversight.

157.    At the time this action was initiated, the Board was comprised of seven directors: Defendants Fogarty, Dawes, Higgins, Lavigne, McKee, Staple and Tyree.   Plaintiff did not make a demand on the Board to institute this action because such a demand would have been a futile, wasteful and useless act.

158.    With respect to defendant Higgins, Higgins is the President and CEO of the Company and has served as a director of the Company since March 2017.  As conceded by the Company in the 2017 Proxy, Defendant Higgins is not an independent director due to his insider status.  Additionally, as demonstrated above, Higgins has repeatedly made and/or caused the Company to make false and misleading statements to the public regarding the adequacy of the Company's compliance programs and the propriety of the Company's promotional practices. Further, Higgins is a named defendant in the Securities Class Action and therefore faces a substantial likelihood of liability, rendering him incapable of independently exercising his business judgment and demand futile.

159.    With respect to Current Director Defendants McKee, Staple, Dawes and Fogarty, the foregoing defendants served on the Compensation Committee during the at all relevant times herein.  As discussed previously, the Compensation Committee was responsible for, among other things: (i) annually reviewing the Company's compensation programs as they relate to the Company's risk management, determining whether and to what extent risks arising from the

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

compensation programs are reasonably likely to have a material adverse effect on the Company and consider methods of mitigating any such risks; and (ii) reviewing and approving employment agreements, severance arrangements, change-in-control agreements and change-in-control provisions affecting any elements of executive compensation and benefits.  Defendants McKee, Staple, Dawes and Fogarty breached their fiduciary duties by reviewing, authorizing and/or recommending that the Board approve the severance arrangements entered into between the Company and Defendants Shively, Schoeneck and Rao which improperly provided for the payment of severance benefits that were inconsistent with the terms of the Management Continuity Agreements entered into with the foregoing executive officers.   As such, defendants McKee, Staple, Dawes and Fogarty face a substantial likelihood of liability thus rendering demand upon them as futile.

160.    With respect to Defendants Staple, Dawes and Lavigne, the foregoing Current Director Defendants have served on the Board since November 2003, April 2008 and July 2013, respectively.  According to the 2017 Proxy, the Company's executive officers participate in the Depomed, Inc. Annual Bonus Plan, which provides for annual cash bonuses based on the achievement of individual and corporate objectives. The 2017 proxy further states that "[e]xecutive officers' bonus payouts are tied in significant part to company-wide corporate objectives approved by the Board that are generally set late in the fourth quarter of the prior year or shortly after the beginning of the current year."  For fiscal 2016, the corporate objectives that the Board approved consisted of the following:

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

| Goal | Weight | Extent Achieved |
|---|---|---|
| 1. Achieve net product sales target of $525 million | 35% | 65% (.2275) |
| 2. Demonstrate financial strength by achieving EPS (non-GAAP) target of $1.50 and positive cash flow targets of $126 million | 20% | 70% (.14) |
| 3. Execute development of the business consistent with three-year strategic plan by achieving the following metrics: (a) increasing demand growth of Nucynta ER; (b) updating three-year strategic plan; and (c) identifying and advancing deals to support three-year strategic plan plus financing, as needed | 15% | 90% (.135) |
| 4. Enhance and protect future cash flow by: (a) positive resolution of Nucynta ANDA litigation; (b) initiation of NUCYNTA contract manufacturing transfer and timelines; (c) successful resolution of inter-partes review ("IPR") appeals; (d) initiation of cebranopadol TQT study by June 2016; (e) conducting end of phase 2 meeting with the U.S. Food and Drug Administration ("FDA") by December 2016; and (f) developing and beginning to implement life cycle plan for products | 20% | 130% (.26) |
| 5. Develop infrastructure and culture to support current and future growth by: (a) enhancing company culture consistent with the Company's vision, mission and values; (b) preparing succession and development plans for directors and above positions; (c) achieving unwanted turnover target of 12% or less and achieving the goal of 25% of manager level and above positions filled internally; (d) completing process mapping exercise for key clinical, regulatory, and supply processes and identifying gaps and ensure mitigation: and (e) developing phase 3 clinical development and regulatory structure, processes and personnel | 10% | 105% (.105) |

161.   By reviewing and approving the foregoing corporate objectives for fiscal 2016, specifically: (i) the achievement of net product sales target of $525 million, (ii) the achievement of positive cash flow targets of $126 million, and (iii) increasing demand growth of Nucynta ER (the Company's highest grossing product), defendants Dawes, Staple and Lavigne breached their fiduciary duties by approving corporate objectives that encourage unnecessary risk taking by executive officers (including engaging in questionable sales and marketing practices to ensure that the objectives were achieved).  As such, defendants Dawes, Staple and Lavigne face a substantial likelihood of liability thus rendering demand upon them as futile.

162.   With respect to defendants Lavigne, Staple and Tyree, the foregoing defendants were members of the Audit Committee at all relevant times herein.  As discussed above, pursuant to the Audit Committee Charter, the Audit Committee is responsible for the following, in relevant part: (i) discussing with management, including the Company's General Counsel, ***the Company's compliance with applicable laws and regulations or other legal matters that may have a material***

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

*effect* on the Company's financial statements and results of operations; (ii) in coordination with the Compensation Committee, ***annually reviewing the Company's compensation plans, programs and policies as they relate to the Company's risk management***; (iii) together, with the NCGC, ***reviewing and overseeing*** (a) ***the Company's policies and procedures regarding compliance with*** applicable laws and regulations, including ***the Company's Code of Business Conduct and Ethics*** ("Code of Ethics") and (b) ***the Company's compliance therewith***; and (iv) together, with the NCGC, discussing at least quarterly with management, including the Company's General Counsel (and Chief Compliance Officer if other than the General Counsel), and receive at least annually a report from the General Counsel (and Chief Compliance Officer if other than the General Counsel) covering, (a) ***the Company's policies and procedures regarding compliance with applicable laws and regulations,*** including ***the Code of Ethics,*** (b) ***the Company's compliance with such laws, regulations and Code of Ethics and (c) the material legal or contractual risks to the Company.***

163.    Defendants Lavigne, Staple and Tyree breached their fiduciary duties by: (i) reviewing, authorizing and/or recommending that the Board approve the severance arrangements entered into between the Company and Defendants Shively, Schoeneck and Rao which improperly provided for the payment of severance benefits that were inconsistent with the terms of the Management Continuity Agreements entered into with the foregoing executive officers; (ii) reviewing, authorizing and/or recommending that the Company adopt compensation plans, policies and practices that encourage unnecessary risk taking which provided a financial motive for Depomed's executive officers to engage in questionable marketing and sales practices of their opioid drugs so that they could achieve their corporate objectives and receive their annual bonus awards; and (iii) failing to exercise adequate oversight over the Company's policies and procedures regarding compliance with the Code and applicable laws and regulations.  As such, defendants Lavigne, Staple and Tyree face a substantial likelihood of liability thus rendering demand upon them as futile.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

164.   Finally, demand upon the Current Director Defendants is excused as futile because each of the seven Current Director Defendants authorized and/or approved the Company's filing of the 2017 Proxy, which contained material misstatements and omissions.

165.   As discussed above, on July 14, 2017, the Company filed the 2017 Proxy with the SEC announcing that the Company's Annual Meeting of Shareholders ("Annual Meeting") would be held on August 15, 2017, during which shareholders would be asked to, among other things, "approve, on an advisory basis, the compensation of the Company's named executive officers." In the Compensation Discussion and Analysis section of the 2017 Proxy, the Company stated the following, in relevant part:

> In connection with this ongoing review, the Compensation Committee continues to revise the executive compensation program to implement and maintain what it believes to be are best practices with respect to executive compensation. The Company's executive compensation corporate governance framework includes the following practices, each of which reinforces our executive compensation objectives:
>
> ***
>
> ***Management Continuity Agreements*** entered into with each of our executive officers provide for double trigger severance benefits meaning that ***both a change in control and termination of employment are required for severance benefits to be paid…***

(Emphasis added).

166.   The foregoing statements are materially false and misleading because as discussed in detail herein and as evidenced by the Company's public filings with the SEC, the Current Director Defendants reviewed, authorized and/or approved the payment of severance benefits to defendants Schoeneck, Shively and Rao that were inconsistent with the terms of the foregoing defendants' Management Continuity Agreements, given that there was no change in control and that the foregoing defendants voluntarily resigned, as opposed to being "terminated."

167.   Additionally, given the Company's admission in the 2017 Proxy that the entire Board is responsible for risk oversight in multiple areas, it can be reasonably inferred that the Current Director Defendants approved and/or were aware of the questionable marketing and sales practices that the Company engaged in with respect to promoting its opioid products and, in breach

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

of their fiduciary duties, falsely misrepresented and/or concealed the Company's involvement in and/or knowledge of the foregoing to the investing public.

168.    Based on the foregoing, the Current Director Defendants face a sufficiently substantial likelihood of liability and accordingly, there is a reasonable doubt as to each Defendant's disinterestedness in deciding whether pursuing legal action would be in the Company's best interest.  Accordingly, demand upon the Current Director Defendants is excused as being futile.

### CAUSES OF ACTION

### COUNT I

### (Against the Individual Defendants for Breach  of Fiduciary Duty)

169.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

170.    The Individual Defendants  owed and   owe Depomed fiduciary obligations, including the obligations of good faith, fair dealing, loyalty  and care. Among other things, the Individual Defendants were and are required to act in furtherance of the best interests of Depomed and its  shareholders so as to benefit all shareholders equally and not in furtherance of their personal  interest or benefit. Each director and officer of the Company owes to Depomed and its shareholders  the fiduciary duty to exercise good faith and diligence in the administration of the Company's  affairs and in the use and preservation of its property and assets, and the highest obligations of  fair dealing. The Individual Defendants breached their fiduciary duties by:

a.      engaging in and/or causing the Company to engage in questionable practices concerning the sales and marketing of the Company's opioid products;

b.      failing to timely disclose that the Senate Committee had commenced an investigation into the Company's sales and marketing practices in connection with the Company's opioid products;

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

c.      investing substantial amounts of money in the promotion and re-launch of Nucynta, despite the Individual Defendants' acknowledgment of the risks associated with the promotion of opioid drugs and the heightened legal and regulatory scrutiny associated with the manufacture, sale and promotion of opioid drugs;

d      failing to implement and maintain an effective system of internal controls over the Company's practices and procedures with respect to the sale and promotion of its opioid drug products;

e.   failing to exercise their oversight duties over the Company's sales and marketing practices with respect to its opioid drug products, including ensuring employees' compliance with all federal, state and local laws, rules and regulations governing the sale and promotion of opioids;

f.   failing to commence an internal investigation into the Company's sales and marketing practices in connection with its opioid drug products after learning of the investigation by the Senate Committee, the DOJ and the Maryland AG;

g.      recommending, authorizing and/or approving severance arrangements with certain of the Individual Defendants that improperly provided for the payment of severance benefits by the Company to certain of the Company's executive officers that voluntarily resigned;

h.      consciously disregarding the risks associated with the promotion and marketing of the Company's opioid products for off-label purposes;

i.      improperly awarding themselves generous and excessive compensation; and

j.      reviewing and approving the dissemination of a proxy statement that contained material misrepresentations and/or omissions.

171.    By reason of the foregoing, Depomed was damaged.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**COUNT II**

**(Against the Individual Defendants for Waste of Corporate Assets)**

172.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

173.    Defendants breached their fiduciary duties by failing to properly supervise and monitor Depomed and by allowing the Company to engage in an illegal, unethical and improper course of conduct.

174.    As a result of the Individual Defendants' illicit course of conduct and breaches of fiduciary duty, Depomed has wasted valuable corporate assets through payments of compensation to the Individual Defendants because the Company has incurred and will continue to incur significant potential liability for legal costs, penalties, fines and/or other legal fees in connection with the defense of the Individual Defendants' unlawful course of conduct complained of herein and in connection with the various investigations commenced by the Senate Committee, the DOJ and the Maryland AG.

175.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

176.    By reason of the foregoing, Depomed has been damaged.

**COUNT III**

**(Against the Current Director Defendants for Violation of § 14(a) of the Securities Exchange Act in Connection with the 2017 Proxy Statement)**

177.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

178.    Each Current Director Defendant authorized the dissemination of the 2017 Proxy Statement.

179.    Rule 14-A-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1  state any material fact necessary in order to make the statements therein not false or misleading."

2  17 C.F.R. § 240.14-A-9.

3      180.    The 2017 Proxy Statement issued by the Board violated § 14(a) and Rule 14-A-9

4  because it falsely misrepresented that the Company has entered into Management Continuity

5  Agreements with each of its executive officers which requires both a change in control and

6  termination of employment for severance benefits to be paid.  As discussed herein, the Current

7  Director Defendants reviewed, authorized and/or approved the payment of severance benefits to

8  defendants Schoeneck, Shively and Rao that were inconsistent with the terms of the foregoing

9  defendants' Management Continuity Agreements, given that Schoeneck, Shively and Rao each

10  received severance benefits despite there being no change in control and that the foregoing

11  defendants voluntarily resigned, as opposed to being "terminated."

12      181.    The misrepresentations were material to a reasonable investor in deciding to vote

13  on the issues presented by the 2017 Proxy, including the approval of the compensation of the

14  Company's named executive officers.

15      182.    The Company was damaged as a direct and proximate result of the dissemination

16  of the 2017 Proxy because it contained material misrepresentations and omissions, as alleged

17  herein, which wasted corporate assets and prevented shareholders from engaging in a fully

18  informed vote for, among other things, approving the compensation of the Company's named

19  executive officers.

20      183.    Plaintiff, on behalf of Depomed, have no adequate remedy at law.

21                              **PRAYER FOR RELIEF**

22      WHEREFORE, Plaintiff demands judgment as follows:

23      A.    Directing Defendants to account to Depomed for all damages sustained  or to be

24  sustained by the Company by reason of the wrongs alleged herein;

25      B.    Directing Depomed to take all necessary actions to reform its corporate

26  governance  and internal procedures to comply with applicable laws and protect the Company

27  and its shareholders from a recurrence of the events described herein, including,  but not limited

28

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

to, directing the Company to undertake a shareholder vote resolution for amendments to Depomed's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote on corporate governance policies;

C.      Awarding to Depomed restitution from the Defendants and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

E.      Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: November 15, 2017                    Respectfully submitted,

                                            **FARUQI & FARUQI, LLP**

                                            By: */s/ Benjamin Heikali*
                                            Benjamin Heikali, Bar No. 307466
                                            10866 Wilshire Blvd., Suite 1470
                                            Los Angeles, CA 90024
                                            Telephone: 424.256.2884
                                            Fax: 424.256.2885
                                            E-mail: bheikali@faruqilaw.com

                              :             **FARUQI & FARUQI, LLP**
                                            Stuart J. Guber
                                            101 Greenwood Avenue, Suite 600
                                            Jenkintown, PA 19046
                                            Telephone: 215-277-5770
                                            Facsimile:  215-277-5771

                                            **FARUQI & FARUQI, LLP**
                                            Nina M. Varindani
                                            685 Third Avenue, 26th Floor
                                            New York, New York 10017
                                            Telephone: 212-983-9330
                                            Facsimile:  212-983-9331

                                            *Attorneys for Plaintiff Gerald Ross*

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1

**RULE 23.1 VERIFICATION**

2      I, Gerald Ross, hereby verify that I am a shareholder of Depomed, Inc. (the "Company"), and

3   am ready, willing, and able to pursue this action in the hope of improving the Company and recovering

4   damages for the Company caused by the defendants' conduct.  I have reviewed the allegations made

5   in this Verified Shareholder Derivative Complaint (the "Complaint") and to those allegations of

6   which I have personal knowledge, I believe those allegations to be true.  As to those allegations of

7   which I do not have personal knowledge, I rely upon my counsel and their investigation and believe

8   them to be true. Having received a copy of this Complaint, having reviewed it with my counsel, I

9   hereby authorize its filing.

10     I hereby declare under penalty of perjury under the laws of the United States of America that

11  the foregoing is true and correct.  Executed this 9th day of November, 2017.

12                                      _____
                                                 Gerald Ross
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**